Steven HOLIDAY, Appellant,

v.

UNITED STATES, Appellee.

Jae Hoa PARK, Appellant,

v.

UNITED STATES, Appellee.

UNITED STATES, Petitioner,

v.

The Honorable Mildred EDWARDS,
Respondent,

James H. Palmer, Real Party in Interest.

UNITED STATES, Petitioner,

v.

The Honorable Mildred EDWARDS,
Respondent,

Frederick Burgess, Real
Party in Interest.

Nos. 95–CF–1054, 95–CF–1390, 95–
SP–1457 and 95–SP–1467.

District of Columbia Court of Appeals.

Argued March 26, 1996.
Decided July 30, 1996.

**64**

Andrew D. Lipps, Washington, DC, appointed by this court, with whom Arthur S. Cheslock and William J. Mertens were on the brief, for appellant Holiday in No. 95–CF–1054.

John R. Fisher, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and Robert T. Swanson and Leslie A. Blackmon, Assistant United States Attorneys, were on the brief, for appellee in No. 95–CF–105.

Robert E. Morin, Washington, DC, with whom Gerald I. Fisher was on the brief, for appellant Park in No. 95–CF–1390.

John R. Fisher, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and G. Bradley Weinsheimer and Elizabeth H. Danello, Assistant United States Attorneys, were on the brief, for appellee in No. 95–CF–1390.

Christopher Warnock, Washington, DC, with whom Eleanor Frucci, Silver Springs, MD, was on the brief, for James H. Palmer, the real party in interest, in No. 95–SP–1457.

Adgie O'Bryant, Jr., filed an appearance on behalf of Frederick Burgess, the real party in interest, in No. 95–SP–1467.

John R. Fisher, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, was on the brief, for petitioner in Nos. 95–SP–1457 and 95–SP–1467.

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

These consolidated cases present a common issue requiring interpretation of the 1995 statute that repealed mandatory-minimum sentences for certain nonviolent drug offenses. We must determine whether the mandatory-minimum sentencing provisions apply when the offense was committed before—but the defendant was sentenced after—the effective date of the repealing legislation. In addition, appellants Holiday and Park argue that a variety of errors during their respective trials—including issues of severance, other crimes evidence, and the constitutionality of the particular punishment for possession with intent to distribute under 50 grams of powdered cocaine—require reversal of their convictions and thus new trials.

After addressing—and deflecting—the threshold question whether the government's petitions for writ of mandamus (alternatively styled as government appeals) are properly before us, we reach the common issue and conclude that mandatory-minimum sentences must be imposed in all four cases under the circumstances presented here. The reason is straightforward. Because the Council of the District of Columbia did not say whether the repealer should, or should not, apply to pending cases, we are compelled by controlling case law to apply two nearly identical statutes enacted to cover such omissions: the so-called federal and local "savings statutes." Congress and the Council, respectively, have deemed each of these statutes—both applicable in the District of Columbia—to be, without exception, a provision of every statute that repeals another statute imposing a penalty, forfeiture, or liability. Both say that unless the repealer "expressly provides" for the repealer itself to apply to pending cases—which unquestionably is not the case here—the old law, *i.e.*, the newly repealed law, shall still apply. We therefore see no choice in the matter but to hold that mandatory-minimum sentencing is still required here.

Finally, after resolving the principal issue, we consider—and reject—the other contentions made in individual cases.

**I.**

Holiday was convicted of a March 23, 1994, distribution of cocaine, D.C.Code § 33–541(a); possession of a prohibited weapon *id.*

§ 22–3214(a) (1989 Repl.); carrying a pistol without a license, *id.* § 22–3204(a); possession of an unregistered firearm, *id.* § 6–2311(a) (1995 Repl.); and possession of unregistered ammunition, *id.* § 6–2361(3). On July 20, 1995, Judge Canan sentenced Holiday to four to twelve years in prison, imposing a mandatory-minimum of four years for the distribution conviction. Holiday was sentenced to one-year term of imprisonment on each of his weapons convictions, to run concurrently with the distribution conviction.

Park was convicted of a June 24, 1993 possession with intent to distribute cocaine, *id.* § 33–541(a), and Judge Richter sentenced her to a mandatory-minimum prison term of five to fifteen years on September 29, 1995.

Palmer pled guilty to a September 15, 1994, distribution of dilaudid, *id.* § 33–541(a), and Judge Edwards sentenced him on September 25, 1995, to three to nine years in prison, not to a mandatory-minimum term. The judge, moreover, suspended execution of the sentence and placed Palmer on probation for two years, adding a condition that he enter and complete an inpatient drug treatment program.

Burgess pled guilty to a November 23, 1993, distribution of cocaine, *id.* § 33–541(a) (1993 Repl.), and Judge Edwards sentenced him on September 28, 1995 to four to twelve years in prison—execution of sentence suspended as to all but time served—and to one year of supervised probation. Again, the judge declined to impose a mandatory-minimum prison sentence.

In short, each of these defendants was convicted of committing non-violent drug offenses in 1993 or 1994, but none was sentenced until after the Council had repealed (as of May 25, 1995) the mandatory-minimum sentencing provisions of D.C.Code § 33–541(c) that were in force on the dates of their crimes. The central question, therefore, is whether the new, more lenient sentencing provisions (omitting mandatory-minimums) can be applied here, simply because sentencing had not taken place until after the effective date of the repealer; or whether instead, because the Council did not say one way or another what sentencing scheme was to apply to cases pending on the effective date, an earlier-adopted general "savings statute" necessarily applies and requires the sentencing judges to impose the mandatory-minimums in effect when the offenses were committed.

## II.

■ There is, however, a preliminary procedural question: whether this court should entertain the government's petitions for writ of mandamus in the two *Edwards* cases (involving Burgess and Palmer). As we have recognized in previous cases, "the writ of mandamus is an extraordinary writ that should be issued only in exceptional circumstances." *Turner v. Bayly,* 673 A.2d 596, 602 (D.C.1996) (quoting *Yeager v. Greene,* 502 A.2d 980, 983 (D.C.1985)). Counsel for Palmer contends that the government has not met its burden of showing that its right to issuance of the writ of mandamus is "clear and indisputable." *Foster v. Canan,* 661 A.2d 636, 636 (D.C.1995) (per curiam) (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.* 485 U.S. 271, 289, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988)). The government notes conflicting authority in this jurisdiction as to its right to appeal, or to petition for a writ of mandamus, to correct an illegal sentencing order. *Compare United States v. Stokes,* 365 A.2d 615, 617 (D.C.1976), *with United States v. Shorter,* 343 A.2d 569, 571 (D.C.1975).

We find it unnecessary to resolve this possible conflict, at least at this time, since we can resolve the merits of the mandatory-minimum sentencing issue on direct appeal in *Holiday* and *Park.* Because Super.Ct.Crim.R. 35(a) (1996) permits the trial court to "correct an illegal sentence at any time," we are confident that steps will be taken to assure that the sentences imposed on Burgess and Palmer will be revisited in light of our rulings in *Holiday* and *Park.*

## III.

Before we discuss the particular repealing legislation at issue here, we believe it is useful to explain the evolution of general savings statutes that inevitably become part of the analysis when a repealer does not

expressly say what classes of cases it covers. (Part A.). We then focus on the quite different approaches the state courts (Part B.) and the federal courts (Part C.) have taken in construing general savings statutes. Appellants stress the predominant state court view that favors retroactive application of ameliorative sentencing legislation despite a general savings statute. The government, on the other hand, presses the federal court approach—derived substantially from Supreme Court authority—that uses the federal general savings statute to bar retroactive application unless the new sentencing legislation itself "expressly" says it shall apply to pending cases. Finally, once we have determined whether the federal and District general savings statutes apply here (we conclude they do), we consider (Part D.) whether, under the terms of the savings statutes, the repealing legislation itself "expressly" provides for retroactive application by making clear that the new sentencing regime applies to pending prosecutions of offenses committed before May 25, 1995.

### A.

■ Although nonpenal statutes traditionally operate prospectively, unless there is evidence of legislative intent to the contrary,[1] an opposite presumption applies to repeals of criminal statutes. At common law, such repealing legislation applied retroactively, abating every prosecution which had not yet resulted in final conviction (including appeal to the highest reviewing court)—unless a special provision had been enacted to save prosecutions under the repealed statute.[2]

■ Pending criminal prosecutions would abate, unless there was a savings clause in the new legislation, whether the legislation was an outright repeal or merely an amendment or reenactment of the substantive crime, since any such revision effectively repealed the statute underlying the prosecution.[3] In this country, moreover, the Constitution affected the abatement analysis. If the new legislation increased the punishment for the same crime, or made previously lawful activity unlawful, the *ex post facto* clause precluded prosecution under the new statute of offenses committed before the statute's effective date.[4] On the other hand, if the repealing legislation enacted more lenient sentencing options, the *ex post facto* clause did not prohibit courts from continuing the prosecution and applying a new ameliorative sentencing scheme to pending cases.[5]

■ As a way of preventing abatements of criminal prosecutions and other liabilities when legislatures failed to provide special savings clauses in the repealing legislation, state legislatures began in the last century to adopt general savings statutes applicable thereafter to all repeals, amendments, and reenactments of criminal and civil liabilities.[6] For criminal prosecutions, therefore, these statutes shifted "the legislative presumption

1. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 841, 110 S.Ct. 1570, 1579, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring).

2. *See Bradley v. United States*, 410 U.S. 605, 607–08, 93 S.Ct. 1151, 1153–54, 35 L.Ed.2d 528 (1973).

3. *See Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660, 94 S.Ct. 2532, 2536, 41 L.Ed.2d 383 (1974); *Bradley*, 410 U.S. at 607–08, 93 S.Ct. at 1153–54.

4. *See Gibson v. United States*, 602 A.2d 117, 121 (D.C.1992) ("The *ex post facto* clause proscribes legislation that retroactively 'alter[s] the definition of crimes or increase[s] the punishment for criminal acts.'") (quoting *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990)); *Cornwell v. United States*, 451 A.2d 628, 630 (D.C.1982) (per curiam) ("A

'law that changes the punishment, and inflects a greater punishment, than the law annexed to the crime, when committed' is an *ex post facto* law.") (quoting *Warren v. United States Parole Comm'n*, 212 U.S.App.D.C. 137, 140, 659 F.2d 183, 186 (1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (emphasis deleted))).

5. *See Sekt v. Justice's Court of San Rafael Tp.*, 26 Cal.2d 297, 159 P.2d 17, 21 *cert. denied*, 326 U.S. 756, 66 S.Ct. 96, 90 L.Ed. 454 (1945) (retroactive application of mitigating statutes "is not complicated by the prohibition against *ex post facto* laws, since it is well settled that beneficial legislation is not within the prohibition of the constitutional provision").

6. Note, *Today's Law and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation*, 121 U.PA.L.REV. 120, 127 (1972).

from one of abatement unless otherwise specified to one of non-abatement in the absence of contrary legislative direction." [7]

When repeal legislation, imposing more lenient punishment, contained a special savings clause, or was to be read in connection with a general savings statute, the court faced the question of statutory interpretation presented in the cases now before us: whether (1) the savings provision preserved the repealed sentencing scheme for a pending prosecution, despite a harsher result than the new legislation called for, or instead (2) the repealing statute, when read together with the savings provision, manifested a legislative intent to apply the lesser punishment from the new statute to pending prosecutions commenced under the repealed statute.

## B.

We begin with the body of authority that appellants emphasize: decisions by state supreme courts. For a variety of reasons, many of these courts have ruled that general savings statutes in their jurisdictions do not preclude retroactive application of ameliorative sentencing provisions.[8] In dissent, Judge SCHWELB relies exclusively on these state cases. None of them, however, can be used to interpret the federal and District of Columbia general savings statutes, which are distinguishable either by reference to their terms or by virtue of federal court—including Supreme Court—interpretations that dictate a different result. We lead with the state court jurisprudence, however, to present up front the best possible case for the defendants' position and to provide background for the particular savings statutes, and the controlling federal case law, that—taken together—eclipse the state court approach and, necessarily, control the analysis here.

7. *Id.*

8. *See, e.g., State v. Coolidge,* 282 N.W.2d 511, 514 (Minn.1979) ("a statute mitigating punishment is applied to acts committed before its effective date, as long as no final judgment has been reached"); *State v. Pardon,* 272 N.C. 72, 157 S.E.2d 698, 702 (1967) ("When, however, the

We begin with New York where the Court of Appeals considered the following general savings language:

> Section 93 declares, "The repeal of a statute or part thereof shall not affect or impair any act done, offense committed * * * penalty, forfeiture or punishment incurred prior to the time such appeal takes effect," and section 94 provides that all proceedings commenced and pending at the time a statute is repealed "may be prosecuted * * * to final effect in the same manner as they might if such provisions were not so repealed." (Ellipses in original.)

*People v. Oliver,* 1 N.Y.2d 152, 151 N.Y.S.2d 367, 372, 134 N.E.2d 197, 201 (1956) (quoting N.Y. GENERAL CONSTRUCTION LAW § 93, 94 (Consol.1956)). Despite the express language saving prosecutions as though the provisions of prior law "were not so repealed," *id.,* the court emphasized that (1) the general savings statute had been adopted primarily to prevent abatement of prosecutions altogether when legislation imposing harsher punishments could not apply retroactively because of the *ex post facto* clause, *id.;* (2) there was no constitutional bar to retroactive application of an "ameliorative statute" reducing punishment for a particular crime, *id.;* (3) the general savings statute was "merely a principle of construction," *id.,* that must give way to discernible legislative intent to the contrary; and (4) the legislature's intent that lighter penalties should be applied retroactively could be inferred from the legislature's very recognition that previous penalties (permitting criminal punishment of juveniles under age 15) had been too severe. *Id.* at 372–74, 134 N.E.2d at 201–02.

The court inferred such legislative intent not from anything the legislature said but from objective scrutiny of the purposes underlying sentencing statutes. The court concluded that, once the legislature had seen the folly of harsher penalties than those newly enacted, any further enforcement of the re-

law under which a defendant was convicted is amended pending appeal so as to mitigate the punishment, it is logical to assume that the legislature intended the new punishment, which it now feels fits the crime, to apply whenever possible.").

pealed penalties could serve no legitimate purpose—only "vengeance or retribution." *Id.* at 373, 134 N.E.2d at 202. Thus, said the court, the legislature must have intended the new law to apply immediately, at least in all cases where sentences had not yet been pronounced and finally adjudicated. *Id.* at 374–75, 134 N.E.2d at 203. The harsher penalties, if applied to defendants still on trial on appeal, no longer could serve as a deterrent to completed conduct. *Id.* at 372–73, 134 N.E.2d at 201. Nor, when compared with the legislature's most recent judgment, could harsher penalties serve the needs for confinement and rehabilitation as effectively as the new sentencing regime would provide. *Id.* at 372–74, 134 N.E.2d at 201–02. The court in *Oliver,* therefore, paid scant attention to the express language of the general savings statute that authorized pending prosecutions to continue "to final effect in the same manner as they might if such provisions were not repealed." *Id.* at 373, 134 N.E.2d at 201. Rather, the court inferred from the new legislation an intent to trump any contrary intent that might be drawn from a general rule of construction enacted by an earlier legislature.[9]

The Supreme Court of Rhode Island, construing a similar, comprehensive general savings statute,[10] readily followed *Oliver.* In *State v. Macarelli,* 118 R.I. 693, 375 A.2d 944, 947 (1977), the court adopted *Oliver's* "sound judicial philosophy" and said that "[t]o hold otherwise ... would amount to nothing more than arbitrary retribution in contravention of the obvious legislative purpose behind the mitigation of the penalty."

Other state courts have reached the same result with somewhat different emphases. In *In re Estrada,* 63 Cal.2d 740, 48 Cal.Rptr. 172, 177, 408 P.2d 948, 953 (1966), the California Supreme Court, overruling recent precedent,[11] essentially adopted the New York court's analysis in *Oliver* but stressed that the California general savings statute [12] could not control because its language "positively expressed [the legislature's] intent that an offender of a law that has been repealed or amended should be punished," but was ambiguous as to whether the defendant in a pending case "should be punished under the old law or the new one." [13]

In *People v. Schultz,* 435 Mich. 517, 460 N.W.2d 505 (1990), the Michigan Supreme Court ignored an explicit general savings statute [14] for still another reason. Focusing

**9.** *See also Elkins v. State,* 659 N.E.2d 563, 565 (Ind.App.1995) (ameliorative amendment is "sufficient indication of the legislative intent that it be applied to all whom such application would be possible and constitutional" (quoting *Lewandowski v. State,* 389 N.E.2d 706, 707 (Ind.1979)); *People v. Behlog,* 74 N.Y.2d 237, 544 N.Y.S.2d 804, 543 N.E.2d 69 (1989) (applying *Oliver* ).

**10.** The Rhode Island general savings statute provided:

No suit, prosecution or indictment, pending at the time of the repeal of any statute for any offense committed * * * shall in any case be affected by such repeal, but such suit, prosecution or indictment, may be proceeded with, and such act shall be deemed to be in force for the purpose of prosecuting the same to final judgment and execution or sentence, as the case may be. (Ellipses in original.)

*State v. Macarelli,* 118 R.I. 693, 375 A.2d 944, 946 (1977) (quoting R.I. GEN.LAWS § 43–3–23).

**11.** *People v. Harmon,* 54 Cal.2d 9, 4 Cal.Rptr. 161, 351 P.2d 329 (1960).

**12.** The California general savings statute provided:

The termination of suspension (by whatsoever means effected) of any law creating a criminal

offense does not constitute a bar to the * * * punishment of an act already committed in violation of the law so terminated or suspended, unless the intention to bar such * * * punishment is expressly declared by an applicable provision of law.

*Estrada,* 48 Cal.Rptr. at 176 n. 2, 408 P.2d at 952 n. 2 (quoting CAL.GOV'T CODE § 9608) (ellipses in original).

**13.** Later California decisions have cited *Estrada* for the general proposition that, " 'where the amendatory statute mitigates punishment and there is no [specific] saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' " *People v. Nasalga,* 12 Cal.4th 784, 50 Cal.Rptr.2d 88, 94, 910 P.2d 1380, 1385 (1996) (quoting *Estrada,* 48 Cal.Rptr. at 177, 408 P.2d at 952).

**14.** The Michigan general savings statute provided:

The repeal of any statute or part thereof shall not have the effect to release or relinquish any penalty, forfeiture, or liability incurred under such statute or any part thereof, unless the repealing act shall so expressly provide and such statute and part thereof shall be treated as still remaining in force for the purpose of

on one of the themes identified in *Oliver*, the court concluded that the statute's historical purpose had been limited to preventing "technical abatements" that would "excus[e] offenders from punishment" altogether; it had not been intended to preclude application of new sentencing legislation to pending cases where the "amendatory act mitigates the authorized terms of punishment but continues to proscribe the same conduct." *Id.* 460 N.W.2d at 510.

The Supreme Court of Hawaii saw yet a different basis for rejecting a general savings provision and remanding to resentence under a new, "lesser mandatory minimum" sentencing scheme. In *State v. Von Geldern*, 64 Haw. 210, 638 P.2d 319 (1981), the court concluded that the general savings statute [15] did not apply to prosecutions pending when this particular sentencing revision was adopted (without its own savings clause), because the legislature's intent for immediate retroactive implementation was clear from its previous use of retroactivity language in *other* criminal statutes. These earlier statutes, said the court, had established "a pattern of conduct evidencing an inclination" to permit "more enlightening sentencing provisions" as soon as possible. *Id.* 638 P.2d at 323.

The Supreme Court of Utah found reason to ignore a general savings statute by focusing on the statutory language. In *State v. Tapp*, 26 Utah 2d 392, 490 P.2d 334 (1971), the court considered whether the following general savings statute precluded the trial judge from imposing a lesser sentence attributable to a statutory amendment adopted between the time the defendant was charged with possessing marijuana and the date of sentencing:

> The repeal of a statute does not * * * affect any right which has accrued, any

duty imposed, *any penalty incurred*, or any action or proceeding commenced *under or by virtue of the statute repealed.* (Emphasis added [by Utah Supreme Court].)

*Id.* 490 P.2d at 336 (quoting Utah Code Ann. § 68–3–5) (ellipses in original). The Court held this statute inapplicable because, by its terms, *"no penalty is incurred* until the defendant is convicted, judgment entered and sentence imposed." *Id.* (emphasis in original). Because a defendant not yet sentenced has "incurred" no penalty, the general savings statute does not apply, and thus the defendant necessarily is subject to the new, more lenient law in effect at time of sentencing.[16] The Utah court, as a consequence, arguably limited the general savings statute to preservation of convictions against collateral attacks after sentencing.

Finally, the Supreme Court of North Dakota ordered application of a new sentencing statute to a pending prosecution for driving without a license when the offense occurred before the new sentencing statute had been adopted but sentencing had taken place thereafter. In *State v. Cummings*, 386 N.W.2d 468 (N.D.1986), after finding a general savings statute inapplicable to the particular statutory title at issue, the court rejected a statutory canon of construction: " 'No part of this code is retroactive unless it is expressly declared to be so.' " *Id.* at 471 (quoting N.D. Cent.Code § 1–02–10). The court perceived that the legislature had an "obvious" (though unspoken) desire for retroactive application of reduced mandatory-minimum penalties. *Id.* at 472. Citing *Oliver* and *Estrada*, the court was impressed, very simply, by the "compelling inference that ... the former penalty was too harsh and that

---

instituting or sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."
*Schultz*, 460 N.W.2d at 509–510 (quoting Mich. Comp.Laws § 8.4a)

**15.** Hawaii's general savings statute provided:
No suit or prosecution pending at the time of the repeal of any law, for any offense committed or for the recovery of any penalty or forfeiture incurred under the law so repealed, shall be affected by such repeal.

*Von Geldern*, 638 P.2d at 322 n. 3 (quoting Haw. Rev.Stat. § 1–11).

**16.** Other states, interpreting similar statutes, have held that the savings statute was inapplicable because the repealed statute did not involve a "penalty." See *Thompson v. Edgar*, 259 A.2d 27, 29 (Me.1969) (suspension of driver's license); *Sherrill v. State*, 14 Md.App. 146, 286 A.2d 528, 532 (1972) (test for criminal responsibility).

the [new] and lighter punishment was the appropriate penalty...." *Id.*[17]

Other state courts have come out differently, holding that the general savings statute requires the trial judge to proceed with the prosecution under the repealed statute.[18] But it is readily apparent that most of the state courts which have considered the issue have been disinclined to apply general savings statutes in this context—and have declined to do so—even in cases, such as *Oliver, Macarelli,* and *Schultz,* where plain language, apparently intended to preserve punishments under the repealed statute, could be seen as air tight.

### C.

Unlike the state courts, the federal courts, applying the federal savings statute, have been disposed to take the statutory language literally. Since 1871, Congress has kept in force a general savings statute, apparently modeled on earlier state statutes,[19] and now codified at 1 U.S.C. § 109 (1994):

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

We have held that this statute, pursuant to D.C.Code § 49–301 (1990 Repl.),[20] applies in the District of Columbia not only to congressional legislation but also to "emergency acts of the D.C. Council" (and thus, presumably, to other Council legislation). *United States v. Alston,* 580 A.2d 587, 600 (D.C.1990).

---

**17.** Some states have relied on statutes to assure retroactive application of ameliorative sentencing legislation. The Vermont legislature, for example, has adopted an ameliorative amendment to its savings clause:

> If the penalty or punishment for any offense is reduced by the amendment of an act or statutory provision, the same shall be imposed in accordance with the act or provision as amended unless imposed prior to the date of the amendment.

*State v. Flagg,* 160 Vt. 141, 624 A.2d 864 (1993) (quoting 1 Vt.Stat.Ann. § 214(c)).

The general savings clause of West Virginia expressly provides for retroactive application of mitigating statutes enacted before the sentence is pronounced but not for retroactive application thereafter. *See State ex rel. Miller v. Bordenkircher,* 166 W.Va. 169, 272 S.E.2d 676, 677 (1980) (per curiam) (ameliorative sentencing provisions of new law *not* applicable to case where judgment was final before repeal of old law became effective). The law provides:

> The repeal of a law, or its expiration by virtue of any provision contained therein, shall not affect any offense committed, or penalty or punishment incurred, before the repeal took effect, or the law expired, save only that the proceedings thereafter had shall conform as far as practicable to the laws in force at the time such proceedings take place, unless otherwise specially provided; and that if any penalty or punishment be mitigated by the new law, such new law may, with the consent of the party affected thereby, be applied to any judgment pronounced after it has taken effect.

*Id.* (quoting W.Va.Code § 2–2–8).

*See also People v. Thomas,* 185 Colo. 395, 525 P.2d 1136, 1137 (1974) (en banc) (interpreting statute providing for post-conviction review when "there has been a significant change in the law, applied to appellant's conviction or sentence, allowing in the interests of justice retroactive application of the changed legal standard" as permitting application of changed legal standards "wherever constitutionally permissible").

**18.** *See Gee v. State,* 508 N.E.2d 787, 789 (Ind. 1987) ("The savings clause ... provides that an offense ... shall be prosecuted and remains punishable under the statute in force at the time the offense was committed."); *State v. Cramer,* 196 Kan. 646, 413 P.2d 994, 996 (1966) (general savings statute preserves "all rights and remedies under a repealed statute when the repealing statute is silent as to whether such rights and remedies shall be abrogated or not."); *State v. Dodge City,* 238 Neb. 439, 470 N.W.2d 795, 797 (1991) ("under the general saving clause a pending action is not affected by the repeal or amendment of a statute, and the laws in effect at the time of the commencement of the action are controlling.").

**19.** Note, *supra* note 6, at 128 & n. 56.

**20.** D.C.Code § 49–301 (1990 Repl.) provides:

> The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except insofar as the same are inconsistent with, or are replaced by, some provision of the 1901 Code. (Omitting citations.)

In the 1930s, the federal courts applied this general savings statute to criminal cases when considering amendment of the Jones Act,[21] which provided penalties for violation of the National Prohibition Act.[22] In 1931, two federal circuit courts of appeals, including the United States Court of Appeals for the District of Columbia Circuit, considered that amendment, which substantially reduced the maximum penalties for selling not more than a gallon of liquor. They held that, in the absence of a provision applying the amendment to previously committed offenses, the general savings statute applied; the amendment "had no application to pending cases." *Hurwitz v. United States*, 60 U.S.App.D.C. 298, 298, 53 F.2d 552, 552 (1931) (citing *Maceo v. United States*, 46 F.2d 788 (1931)).[23]

Another case should be mentioned. In *Jones v. United States*, 117 U.S.App.D.C. 169, 327 F.2d 867 (1963), the D.C. Circuit confronted a case in which the defendant, found guilty of first-degree murder, had pending a petition for writ of certiorari in the Supreme Court when Congress repealed the mandatory death penalty. The court recognized that a specific savings clause in the repealing legislation preserved the defen-

dant's sentence under the prior statute, but the court added that, "[q]uite apart from the language of the [repealer]," the general savings statute, 1 U.S.C. § 109, was "nonetheless apt." *Id.* at 172, 327 F.2d at 870; *see also Duffel v. United States*, 95 U.S.App.D.C. 242, 243, 221 F.2d 523, 523–24 (1954) (per curiam) (applying both general savings statute, 1 U.S.C. § 109, and special savings clause in repeal legislation to preserve sentence imposed under repealed statute after effective date of repealer). On this authority, the court reached the "inescapable" conclusion that "the death sentence not only was mandatory, final and unreviewable, but that sentence had not been vacated by the amendatory Act." *Jones*, 117 U.S.App.D.C. at 173, 327 F.2d at 871.

Other cases from this jurisdiction add nothing of relevance, either because the decision turned solely on a special savings clause in the repeal legislation preserving the repealed penalty for pending prosecutions,[24] or because ·the amending legislation was adopted after the defendant's sentence had been finally adjudicated,[25] or because the reviewing court did not address the savings clause issue.[26]

**21.** Pub.L. No. 70–899, 45 Stat. 1446 (codified in 27 U.S.C. § 91, 92 (1929)) (repealed 1935).

**22.** Pub.L. No. 66–66, 41 Stat. 305 (1919), Pub.L. No. 67–96, 42 Stat. 222 (1921), Pub.L. No. 70–899, 45 Stat. 1446 (1929) (codified as amended in scattered sections of 27 U.S.C.) (repealed 1935)).

**23.** One cannot tell from either circuit court opinion whether sentence initially had been pronounced before or after the effective date of the amendment reducing penalties. The briefs filed in *Hurwitz* reveal that the amendment had become effective before sentencing, whereas the dates in *Maceo*—offense committed in 1929, amendment effective January 15, 1931, appeal decided less than a month later, February 12, 1931—strongly suggest that the defendant had been sentenced before the amendment became effective. It would appear, however, that *Maceo* was a direct appeal of that sentence, not a collateral attack. Thus, neither Hurwitz's nor Maceo's sentence had been finally adjudicated before the ameliorative amendment had become effective. *See Pendergrast v. United States*, 135 U.S.App. D.C. 20, 26 n. 31 (conviction is final only after "the judgment of conviction was rendered, the availability of appeal exhausted and the time for petition for certiorari elapsed or a petition for

certiorari denied"), *cert. denied*, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969). Because the cases before us here present only the factual situation present in *Hurwitz*, we do not decide whether there may be situations in which the apparently different timelines in *Maceo* and *Hurwitz* would produce different legal results.

**24.** *See Quick v. District of Columbia*, 71 A.2d 771, 771 (D.C.1950).

**25.** *See Johnson v. United States*, 576 A.2d 739, 740 (D.C.1990) (per curiam) (collateral attack on sentence through motion to vacate).

**26.** *See Melson v. United States*, 505 A.2d 455 (D.C.1986) (per curiam). In *Melson*, the defendant had committed an offense when the Federal Youth Correction Act (FYCA) was in place but was sentenced after the FYCA had been repealed. The trial court sentenced him under the FYCA and the defendant appealed, contending he should receive an adult sentence (which, under the circumstances, would have had the effect of releasing him from incarceration earlier). An examination of the briefs filed on appeal reveals the defendant argued that the general savings statute, 1 U.S.C. § 109, did not apply. Rather than contest that argument, the government ar-

More recently, in *United States v. Ross*, 464 F.2d 376 (2d Cir.1972), the United States Court of Appeals for the Second Circuit considered whether the defendant should have the benefit of the Comprehensive Drug Abuse Prevention and Control Act of 1970,[27] which repealed sundry federal narcotics laws (including mandatory-minimum sentencing provisions). The question arose because "his sentence was imposed after the effective date of the new Act." *Id.* at 378. The court held that a specific savings clause in the 1970 Act preserved for pending prosecutions the sentences imposed under the prior act, but the court "buttressed" its decision by applying the general savings statute, 1 U.S.C. § 109.

The *Ross* court rejected arguments which, as we have seen, satisfied various state courts. For example, *Ross* gave short shrift to the proposition that the general savings statute applied only to "technical abatement" of an entire prosecution, not to mere sentencing issues.[28] *Id.* at 380. *Ross* also rejected the contention that, because § 109 literally applied only to save a "penalty, forfeiture or liability *incurred*" under the repealed statute, the savings statute must apply only to collateral attacks on sentences already imposed.[29] *Id.* at 379 (emphasis added). Rather, the court in *Ross* emphasized the plain language of § 109 that "[t]he repeal of any statute shall not ... extinguish any penalty, forfeiture, or liability incurred under such statute," and concluded that, because "sentencing is an integral part of the prosecution," *id.* at 379, it was "incurred" (meaning it had accrued) as of a time when the criminal act was committed, *before* the new sentencing provisions became effective.

Within a year the Supreme Court gave powerful support, albeit indirectly, for the Second Circuit's application of § 109 in *Ross*. In *Bradley v. United States*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973), the Court addressed the specific savings clause in the Comprehensive Drug Abuse Prevention and Control Act of 1970 and sustained the ruling of the First Circuit which, like the Second Circuit in *Ross*, had held the more lenient sentencing provisions of the 1970 Act unavailable. In construing the savings clause— " 'Prosecutions for any violation of law occurring prior to the effective date of [the Act] shall not be affected by the repeals or amendments made by [it] ... or abated by reason thereof' "—the Court confirmed in *Bradley* that sentencing is part of the prosecution; the sentence is not part of a subsequent, severable proceeding. *Bradley*, 410 U.S. at 608, 93 S.Ct. at 1154 (quoting § 1103(a) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1294) (ellipsis in original). "In the legal sense, a prosecution terminates only when the sentence is imposed." *Id.* at 609, 93 S.Ct. at 1154. Thus, any prosecution commenced before the effective date of a statutory amendment of the sentencing scheme is not affected by the amendment, even though sentence has not been imposed, since the prosecution—deemed to include the eventual sentence—began before the amendment became effective.

The Court extended its special savings clause analysis in *Bradley* to the general federal savings statute in *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). There, the Court held that § 109 saved the no-parole provisions repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, keeping them in place for prose-

---

gued that, by definition, an adult sentence was harsher than an FYCA sentence and accordingly that, because of the *ex post facto* clause, the judge had to sentence under the FYCA. This court reversed, holding the FYCA sentence was invalid because "the express language of the Crime Control Act removed the statutory authority for FYCA commitments effective October 12, 1984; [and] the defendant waived any right to constitutional protection." *Id.* at 456. This court accordingly did not come to grips with the general savings statute issue. For that reason, we cannot say the result in *Melson* binds this court, under *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), to

hold that the trial judges in the present cases may not impose mandatory-minimum sentences.

27. Pub.L. No. 91–513, 84 Stat. 1236, 1242 (short title codified at 21 U.S.C. § 801 (1994)).

28. *See supra* note 14 and accompanying text (discussing *Schultz*, 435 Mich. 517, 460 N.W.2d 505 (1990)).

29. *See supra* Part III.B. (discussing *Tapp*, 26 Utah 2d 392, 490 P.2d 334 (1971)).

cutions commenced before May 1, 1971, the effective date of the Act. Marrero argued that "because the decision to grant parole under § 4202 is for the Board of Parole, not the trial judge, and is arrived at after the sentence has been entered and the prosecution has come to an end, the parole eligibility decision is not part of the 'prosecution' for purposes of § 1103(a) [the specific savings clause]." *Marrero*, 417 U.S. at 658, 94 S.Ct. at 2535. The Court rejected Marrero's argument, concluding that statutory eligibility for parole, necessarily determined at the time of sentencing, was inherently part of the prosecution commenced before the effective date of the repealer and, thus, that Marrero's statutory no-parole status was preserved both by the special savings clause of the 1970 Act and—in an alternative holding, *id.* at 659 & n. 10, 94 S.Ct. at 2536 & n. 10—by the general savings statute, 1 U.S.C. § 109.[30]

 Before the general savings statute, 1 U.S.C. § 109, can be held to preserve a penalty, of course, the repealer must "release or extinguish" a penalty. In this connection, *Marrero* makes clear that when a statute restores sentencing discretion over an option previously foreclosed (in that case parole eligibility), the repealer has "extinguished" a mandatory penalty—triggering application of

the general savings statute—even though the sentencing judge could still achieve the result of the repealed statute (*e.g.*, foreclose parole) through the exercise of discretion in a particular case. *See Marrero*, 417 U.S. at 663–64, 94 S.Ct. at 2538–39. The Court noted in *Marrero* that Congress originally had withheld parole eligibility from certain narcotics offenders—thereby effectuating "lengthy mandatory minimum sentences as a means of decreasing both drug addiction and trafficking," *id.* at 662, 94 S.Ct. at 2537—in much the same way that the Council did by establishing mandatory-minimum sentences. The Court then held that the no-parole provision (*i.e.*, mandatory-minimum sentence) was a "penalty, forfeiture or liability" saved by § 109." *Id.* at 664, 94 S.Ct. at 2538. Subsequently, at least two federal circuit courts of appeals have held that statutes conferring new discretionary sentencing power on trial judges, by repealing mandatory denial of probation eligibility, triggered the general savings statute, 1 U.S.C. § 109, because they released or extinguished a mandatory penalty. *See United States v. Jacobs*, 919 F.2d 10, 12 (3d Cir.1990) (probation eligibility); *United States v. Cook*, 890 F.2d 672, 675–76 (4th Cir.1989) (same).[31] Without doubt, there-

---

30. Judge SCHWELB distinguishes *Marrero* as a case, like *Johnson*, 576 A.2d at 739, *supra* note 25, where the defendant had been sentenced before enactment of the ameliorative statute. *Post* at 100 n. 15. The Court's analysis in *Marrero*, however, unlike that in *Johnson*, did not turn on the fact that Marrero's conviction was final before the effective date of the repealing statute. Rather, the Court focused on the later parole decision date and considered whether the Board of Parole's decision—to be made after the effective date of the repealing statute—was still part of the prosecution (commenced before the repealer's effective date) and thus subject to savings statute analysis. The Court in *Marrero*—drawing heavily upon the reasoning of *Bradley*, 410 U.S. at 605, 93 S.Ct. at 1152–53 (where the defendant had been convicted and sentenced after the effective date of the repealing statute)—focused only on two dates: it related the parole decision date back to the date the prosecution was commenced. Accordingly, although the Court concluded that parole eligibility was determined at sentencing, the Court was not concerned about whether the sentencing date itself was before or after the effective date of the repealing statute. In short, the Court did not rely on the distinction that Judge SCHWELB now

suggests puts *Marrero* in a separate analytical class.

31. The Supreme Court has used the same rationale—focusing exclusively on the statute's facial mandatory-minimum, without regard to the exercise of judicial discretion—in finding violations of the *ex post facto* clause. In *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), the Court held that a mandatory fifteen year sentence with possibility of parole for grand larceny was a "more onerous" penalty than a discretionary sentence of up to fifteen years, even though the convicted felons could end up with the same period of incarceration; "the *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed." *Id.* at 401, 57 S.Ct. at 799. *See also United States v. Paskow*, 11 F.3d 873, 877 (9th Cir.1993) (statutory amendment increasing penalty imposed upon revocation of supervised release violated *ex post facto* clause when applied to underlying offenses committed before amendment was adopted; "[i]t is the difference between a court's *discretion* to sentence a defendant to a particular term—or to one substantially shorter—and the absolute *requirement* that the defendant be sentenced to at least that

**74** ■

fore, the federal courts—including, most importantly, the Supreme Court—leave no room for arguing that the repeal of mandatory-minimum sentences can be construed not to "release or extinguish" a penalty "incurred" (accrued) before the effective date of repeal.[32]

The weight and reasoning of these federal cases leave no room for this court to adopt the reasoning of the state supreme courts that have held a general savings statute inapplicable because it is ambiguous (*Estrada*), or expressly is limited to preserving sentences already imposed (*Tapp*), or is an optional canon of statutory construction (*Oliver*), or must be construed by reference to legislative intent in other criminal statutes (*Von Geldern*), or is relevant only to "technical abatements" of an entire criminal offense (*Schultz*).

On the other hand, none of the Supreme Court and other federal cases cited deals with the second half of the required analysis under § 109: the repealing statute shall not extinguish any penalty incurred (*i.e.,* accruing) under the repealed statute "*unless the repealing Act shall so expressly provide.*" 1 U.S.C. § 109 (emphasis added). In this jurisdiction, for example, there was not even a hint in *Hurwitz* that the amendment to the liquor act penalties had an express retroactivity provision that arguably supplanted the general savings statute. Appellants make

such an argument here—to which we now turn.

**D.**

**(1)**

■ On December 6, 1994, the Council of the District of Columbia enacted legislation repealing the mandatory-minimum sentences for distribution and possession with intent to distribute controlled substances, namely, the District of Columbia Nonviolent Offenses Mandatory–Minimum Sentences Amendment Act of 1994, D.C.Law 10–258, 42 D.C.Reg. 238 (effective May 25, 1995). This statute included the following provisions prescribing the repeal and its effective date:

> Sec. 3. Section 401(c) of the District of Columbia Uniform Controlled Substances Act of 1981, effective August 5, 1981 (D.C.Law. 4–29; D.C.Code § 33–541(c)) is repealed.

> Sec. 4. This act shall take effect after a 60–day period of Congressional review following approval by the Mayor (or in the event of veto by the Mayor, action by the Council of the District of Columbia to override the veto) as provided in section 602(c)(2) of the District o[f] Columbia Self–Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 813; D.C.Code § 1–233(c)(2)), and publication in either the District of Columbia Register, the District o[f] Columbia

---

term, that implicates the first prong of the *ex post facto* prohibition [inflicting a greater punishment on the defendant]").

**32.** Judge Schwelb argues, to the contrary, that the mandatory-minimum repealer "effectively preserved, and did not release or extinguish, penalties previously in effect," *post* at 101, simply because a judge can still impose, by exercising discretion under the new statute, the longer, minimum sentences automatically required under the old one. He says "the sentencing court's retention of the authority to impose sentences far more severe than the previous mandatory minimum terms conclusively refutes the notion that the prior penalties have been 'extinguished' or 'released.'" *Post* at 100. First, as indicated earlier in the text of this opinion, his position ignores the case law. *See, e.g., Marrero,* 417 U.S. at 663–64, 94 S.Ct. at 2538–39. Second, his assertion is self-refuting because the repealer clearly extinguishes a more onerous, mandatory,

penalty—as evidenced by Judge Edwards' exercise of discretion to impose more lenient sentences in Palmer's and Burgess's cases, as well as by Judge Richter's and Judge Canan's announced willingness to impose lesser sentences in Park's and Holiday's cases, respectively, if mandatory-minimums were not required. Finally, Judge Schwelb asks us to be "just a bit 'earthy' about the problem." *Post* at 103. We therefore note the practical impact here. As Judge Schwelb himself points out, after enactment of mandatory-minimum sentencing, "a defendant had no incentive to plead guilty as his [or her] sentence was pre-ordained," and prosecutors began to offer pleas of "attempted distribution" or "attempted possession with intent to distribute" as a way around mandatory sentencing. *Post* at 92. This development itself evidences the fact that defendants and prosecutors alike perceived a considerable difference between mandatory and discretionary penalties, and that repeal of the former would—as a matter of real world impact—extinguish a penalty.

Statutes-at-Large, or the District of Columbia Municipal Regulations.

Aside from whatever can be inferred from Sec. 4 spelling out the effective date, this repealing legislation itself contains no language concerning what effect the repeal of mandatory-minimum sentences was to have on pending prosecutions.

All four defendants in the cases on appeal committed offenses before May 25, 1995 but were sentenced several months after that date.[33] The common issue on appeal, therefore, is whether the law required the trial courts to impose mandatory-minimum sentences under D.C.Code § 33–541(c) (1993 Repl.), repealed at the time of sentencing, or permitted the courts to impose more lenient sentences under the amended statute, *id.* § 33–541 (1993 Repl. & 1995 Supp.).

(2)

At this point we should explain that 1 U.S.C. § 109 is not the only general savings statute we must deal with here. In 1990, little more than four years before enacting the repeal of mandatory-minimum sentences, the Council of the District of Columbia enacted its own local savings statute:

> The repeal of any act of the Council shall not release or extinguish any penalty, forfeiture, or liability incurred pursuant to the act, and the act shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution

for the enforcement of any penalty, forfeiture, or liability, unless the repealing act expressly provides for the release or extinguishment of any penalty, forfeiture or liability.

The "DISTRICT OF COLUMBIA STATUTORY SAVINGS PROVISION ACT OF 1990," D.C.Law 8–165, 37 D.C.Reg. 4827 (effective Sept. 26, 1990) (codified at D.C.Code § 49–304(a) (1996 Supp.)). For purposes of these appeals, all parties agree that, because the language of the District's savings statute is essentially the same as that of the federal statute, 1 U.S.C. § 109, there is no material difference between the two savings statutes as applied to these cases.[34] Thus, no one contends, for example, that despite our analysis in *Alston* and other cases, only the District's savings statute applies, and that this court is free to interpret its provisions differently from the construction the federal courts have given to 1 U.S.C. § 109.[35]

We therefore focus our attention on the identical mandates of both general savings statutes: they preserve repealed sentencing provisions for all prosecutions pending at the time the repealing legislation becomes effective, "unless the repealing act expressly provides" for immediate extinguishment of the repealed provisions.

(3)

In § 4 of the mandatory-minimum repealer quoted earlier, the Council expressly provid-

**33.** Burgess, Holiday, Park, and Palmer were indicted, respectively, on December 8, 1993, March 31, 1994, June 9, 1994, and November 22, 1994. They were sentenced, respectively, on June 27, 1995, July 20, 1995, September 29, 1995, and September 25, 1995.

**34.** No party argues—nor does Judge SCHWELB— that D.C.Code § 49–304(a) amends or repeals 1 U.S.C. § 109 as applied to the District of Columbia. *But cf.* D.C.Code § 1–208(b) (1992 Repl.) (Council may amend or repeal acts in force on January 2, 1975).

**35.** In *Alston,* this court reversed a trial court order when that order had dismissed indictments on the ground that the emergency legislation underlying the prosecution had expired and that the Council lacked authority to adopt successive emergency acts to keep the offense alive. *Alston,* 580 A.2d at 599–600. This court sustained the prosecution, in part, on the ground that the federal general savings statute, 1 U.S.C. § 109, pre-

vented abatement during the one-day gap between expiration of the first emergency act and the effective date of the second emergency act. *Id.* Without the benefit of our ruling in *Alston,* and given Alston's contention in the trial court that the prosecution had abated, the Council adopted emergency, then temporary, then permanent "savings" legislation. District of Columbia Statutory Savings Provision Act of 1990, D.C.Law 8–165, 37 D.C.Reg. 4827 (effective Sept. 26, 1990) (codified at D.C.Code § 49–304(a) (1995 Supp.)). *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 8–552, the "DISTRICT OF COLUMBIA STATUTORY SAVINGS PROVISION ACT OF 1990," at 2 (May 16, 1990). The committee report does not specifically refer to 1 U.S.C. § 109, but there is no discussion to indicate that the Council intended D.C.Code § 49–304(a) to differ in any material respect from 1 U.S.C. § 109.

ed for an effective date immediately at the end of the "60–day period of Congressional review"; the Council did not use emergency legislation to make the repealer effective immediately upon enactment.[36] Actually, the Council provided for an effective date 30 days *later* than the normal course of legislation would have produced, since the Council specified a 60–day period of review, such as that applicable to most criminal statutes,[37] rather than the 30–day period of review that otherwise would have applied to amendments of Title 33, where the mandatory-minimum sentencing provisions were codified.[38] In short, if the Council had not expressly provided that the statute become effective after a 60–day period of congressional review, the repeal of § 33–541(c) would have become effective 30 days sooner.

In announcing this effective date, however, the Council did not address in the statute an obvious question: when the act became effective, did it apply (1) only to offenses committed *after the effective date, or (2) to offenses charged after the effective date* even though some may have been committed before that date, or (3) perhaps to all pending prosecutions where the trial court had not yet imposed sentence, or (4) possibly to all prosecutions where sentence had been imposed but the judgments of conviction were not yet final on appeal, or (5) even to final convictions where offenders were serving their sentences? [39]

The legislative history—as the parties agree—is inconclusive. On March 31, 1994, Councilmembers Lightfoot and Thomas introduced Bill 10–617 which, among other things, would repeal D.C.Code § 33–541(c) (imposing mandatory-minimum sentences for distribution and possession with intent to distribute controlled substances). COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 10–617, THE

"DISTRICT OF COLUMBIA NONVIOLENT OFFENSES MANDATORY-MINIMUM SENTENCES AMENDMENT ACT OF 1994," at 2 (October 26, 1994) [hereafter MANDATORY-MINIMUM REPORT]. Bill 10–617 was referred to the Committee on the Judiciary, which held a public hearing on October 17, 1994. *Id.* Almost everyone who appeared at the hearing supported the repealer. *Id.* at attachments. United States Attorney Eric H. Holder, Jr., however, expressed concern, indicating that mandatory-minimums "serve several useful purposes." *Id.* He concluded that, "[i]f changes are to be made, we believe that only the length of those sentences should be examined." *Id.* When the bill came before the Judiciary Committee on October 26, 1994, Councilmember Ray, embracing Mr. Holder's suggestion, proposed an "Amendment in the Nature of a Substitute" that would retain mandatory-minimum prison terms but reduce them "to 2 years for the first offense, 4 years for the second offense and 6 years for the third offense." *Id.* at 5. The Committee accepted the substitute and filed the MANDATORY-MINIMUM REPORT with the Council on Bill 10–617 (as modified by the "substitute"). In that October 26, 1994 report, after generally stating the bill's purpose—"to reduce the mandatory-minimum sentences for non-violent, unarmed drug offenders"—the following language appeared: "Reducing mandatory-minimums for non-violent *offenders charged after the effective date of the act* will also make more space available in the District's corrective facilities for violent offenders." *Id.* at 2 (emphasis added).

The Council, however, did not accept the compromise the Committee proffered. Councilmember Lightfoot immediately moved adoption of an amendment that would reinstate the repeal of mandatory-minimums that he and Councilmember Thomas originally had proposed. Transcript, Council of Dis-

---

**36.** D.C.Code § 1–229(a) (1992 Repl.) (emergency legislation "take[s] effect immediately upon enactment" and is "effective for a period of not to exceed 90 days").

**37.** Statutes that will be codified in Title 22, 23, or 24 of the D.C.Code "shall take effect at the end of the 60–day period" of Congressional review. D.C.Code § 1–233(c)(2) (1992 Repl.).

**38.** Statutes not to be codified in Titles 22, 23, or 24 of the D.C.Code, and not subject to certain other exceptions not relevant here, take effect after a 30–day period of Congressional review. D.C.Code § 1–233(c)(1).

**39.** We do not consider whether this fifth option—a "legislative pardon"—would be lawful.

trict of Columbia, 36th Legislative Meeting, at 232 (November 1, 1994). No express provision was added to clarify the reach of the amendment, and there was no such discussion before the Council voted. *Id.* The Council adopted the bill—the repeal, not reduction, of mandatory-minimums—as Councilmember Lightfoot had proposed. THE "DISTRICT OF COLUMBIA NONVIOLENT OFFENSES MANDATORY-MINIMUM SENTENCES AMENDMENT ACT OF 1994," D.C.Law 10–258, § 3, 42 D.C.Reg. 238, 238 (effective May 25, 1995) (codified at D.C.Code § 33–541 (1995 Supp.)).[40]

When this legislative history was called to the trial court's attention, first in *Holiday* and later in *Park,* the defense counsel and the prosecutor both found the language ambiguous, and neither party argued it was conclusive. In its written pleadings and at argument on the sentencing motion, the government took the position that the words "offenders charged after the effective date" basically were forward looking, rather than allowing for retroactive application, and should be construed to mean "offenses *committed* after the effective date," (emphasis added), in order to avoid "potential *ex post facto* problems." [41] The government also emphasized that the absence of express language applying the repealer to offenses committed before the effective date required the court to apply the substantive provisions of the general savings statute, preserving sentencing for those offenses under the repealed law.

Counsel for appellants Holiday and Park (incorporating by reference the pleadings in *Holiday* ) picked up on a theme suggested by Judge Canan: that the language in the MANDATORY-MINIMUM REPORT—"offenders

charged after the effective date"—may have applied only to the substitute Committee bill that merely reduced, rather than repealed, the mandatory-minimums. For that reason, according to counsel, this language had no bearing on the repealer finally adopted. Counsel added that offenses "charged" after the effective date inevitably would cover at least some offenses committed before that date; that the government's pure prospectivity argument accordingly fell short; and that, in any event, nothing in the Committee's language said the repealer was *"limited* to persons subsequently charged."

In short, the government, while arguing that the Committee language should be construed to preclude application of the repealer to all offenses committed before its effective date, primarily advocated the savings statute as the way around an ambiguous, incomplete legislative history. The defense, on the other hand—while arguing that if the Committee language applied, it should be understood to reach back to embrace at least some offenses committed before the repealer's effective date—primarily urged that the MANDATORY-MINIMUM REPORT did not apply to the particular repealer adopted. The defense then pressed the line of state cases, discussed earlier, that rejected general savings statutes. The judge, finding no helpful legislative history, agreed that case law construing the savings statute would control—and then sided with the government. No one at trial—or on appeal for that matter—has argued that the legislative history is conclusive.

We are satisfied that the language of the MANDATORY-MINIMUM REPORT cannot be rejected simply on the ground that, because the Council adopted the original Lightfoot-

---

**40.** The legislative history of the law is explained as follows in 42 D.C.Reg. 2843 (June 9, 1995): Pursuant to Section 412 of the District of Columbia Self–Government and Governmental Reorganization Act, P.L. *93–198* "the Act", the Council of the District of Columbia adopted Bill No. 10–617 on first and second readings, November 1, 1994 and December 6, 1994, respectively. The legislation was deemed approved without the signature of the Mayor on December 30, 1994, pursuant to Section 404(e) of "the Act", and was assigned Act No. 10–392, and published in the January 13, 1995, edition of the D.C. Register (Vol.[42] page 238) and

transmitted to Congress on February 7, 1995 for a 60–day review, in accordance with Section 602(c)(2) of the Act.

The Council of the District of Columbia hereby gives notice that the 60–day Congressional Review Period has expired, and therefore, cites this enactment as D.C.Law 10–258, effective May 25, 1995.

**41.** No such problem was articulated, and, given the ameliorative impact of the new legislation, the government's *ex post facto* argument lacked discernable content.

Thomas bill rather than the Committee substitute, the MANDATORY-MINIMUM REPORT language had no bearing on the matter. The experience and policy underlying the repealer were the same as those underlying the proposed reduction of mandatory-minimums, and thus the fact that the Council adopted the former rather than the latter would have no apparent bearing on the class of cases to be covered by the legislative change.

On the other hand, the single Committee reference, without elaboration, to "offenders charged after the effective date" cannot be held conclusive. There was no record of any discussion in committee—or at the Council—about the reach of the repealer; for all we can tell this was committee staffer language generally referring to the concept, but not to the definitive detail, of an effective date drawn from the large number of possible alternatives. Moreover, the date criminal charges are filed is a far less rational line to draw than others—the date of the offense, sentencing, or final adjudication—for purposes of defining the class covered.[42] Accordingly, something more than a clause in a committee report, without analysis, should be required before a court pays definitive attention.

Furthermore, the federal and local general savings statutes apply, according to their terms, unless the repealing act itself "expressly provides" otherwise. D.C.Code § 49–304(a); accord 1 U.S.C. § 109. The MANDATORY-MINIMUM REPORT does not include the kind of assurance needed to conclude that the Council, by statute, has "expressly" provided for application of the repealer to one group of cases or another. We do not necessarily say that legislative history can never supplement statutory language in such a way that, when read together, they trump application of a general savings statute. In this case, however, the legislative history is too scant and unreasoned to serve as an "express" basis

for saying the general savings statutes do not apply.

Finally, as the government noted at trial, to the extent the MANDATORY-MINIMUM REPORT language has any utility here, we note it at least is forward-looking, is consistent with the theory underlying the general savings statutes, and does not help defendants who are charged, as in these cases, before the effective date of the repealer. All things considered, therefore, we are not comfortable determining the applicable reach of the repealing legislation solely by reference to the Committee language.

(4)

The only way to conclude, as appellants would have it, that the Council "expressly" provided for application of the repealer to all pending prosecutions where sentence had not been imposed (or adjudicated to a final conviction) is to say that there is some kind of objectively discernable imperative—inherent in adopting ameliorative sentencing legislation—which unambiguously means that the very reference to an effective date signals effectiveness *immediately,* including application to proceedings in pending prosecutions commenced at a time when harsher sentences were anticipated.[43]

This possible rationale is the only one we can think of to make a bare effective date provision, as such, an "express" directive for retroactive application of the repeal of mandatory-minimum sentences. It is akin to the reasoning of the New York Court of Appeals in *Oliver:* the view that any rational person, viewing the matter objectively, would have to agree that failure to apply the new sentencing rules retroactively would amount to unacceptable "vengeance or retribution." *Id.,* 151 N.Y.S.2d at 373, 134 N.E.2d at 202. We cannot agree, however, that *Oliver* expresses the only rational possibility. We cannot say that a legislature could not rationally conclude that the best approach would be a purely prospective one, so that all defendants

42. *See Jackson v. United States,* 495 F.2d 349, 352 (8th Cir.1974) (rejecting argument that prosecution begins when offense is charged instead of when offense is committed.)

43. *See State v. Heath,* 85 Wash.2d 196, 532 P.2d 621, 622 (1975) (despite express provision of effective date of statutory amendment, "the precise language of the statute [is] of little help in determining whether it is or is not to be given such retroactive applicability.")

who committed crimes before the statute became effective would be treated equally. Otherwise, sentencings could get caught up in manipulations with unfair results overall. Some convicted felons, for example, might be able to arrange sentencing delays to take advantage of the new sentencing scheme, whereas others could not achieve the same result before less sympathetic judges. But, more fundamentally, we see nothing irrational in a legislative conclusion that individuals should be punished in accordance with the sanctions in effect at the time the offense was committed, a viewpoint encompassed by the savings statutes themselves. In short, absent an express provision specifying the class or classes to which the new sentencing scheme applies, we cannot conclude that, "obviously" and inevitably, the legislature must have intended a retroactive, rather than a prospective, approach.

If we were dealing with general savings statutes that were ambiguous as to whether the repealed sentencing statute itself was saved (as in *Estrada*), or were written loosely enough to permit an implied legislative intent to override the general savings statutes, then perhaps we could see at least an opening for the argument that the general savings statutes should not apply here. But both statutes say the repealing legislation must "expressly provide" for extinguishment of the repealed statute, as applied to "any penalty ... incurred pursuant to the [repealed] act." D.C.Code § 49–304(a). The mandatory-minimum repealer, however, does not do so by any reasonable stretch of the words "expressly provide."

■ In applying the general savings statutes we are not dealing with optional rules of statutory construction; they are substantive provisions deemed a part of every statute that amends or repeals another statute imposing a penalty, forfeiture, or liability, just in case the scope of an effective date or other applicability provision is not sufficiently spelled out. *See Hertz v. Woodman*, 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001 (1910); *Great Northern Ry. Co. v. United States*, 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567 (1908).[44]

---

**44.** The Supreme Court has recognized that the federal general savings statute is not an optional rule of construction but is to be read instead as a substantive provision incorporated into every statute that amends or repeals another statute imposing a penalty, forfeiture, or liability. The Court explained in *Great Northern Ry. Co.*, 208 U.S. at 465, 28 S.Ct. at 316:

This provision [the statutory predecessor of the general savings statute, 1 U.S.C. § 109] but embodies § 4 of the act approved February 25, 1871, c. 71, 16 Stat. 431, which was entitled "An Act prescribing the Form of the enacting and resolving Clauses of Acts and Resolutions of Congress, and rules for the construction thereof." As the [general savings statute] in question has only the force of a statute, its provision cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment. But while this is true the provisions of [the savings statute later recodified as 1 U.S.C. § 109] *are to be treated as if incorporated in and as a part of subsequent enactments,* and therefore under the general principles of construction requiring, if possible, that effect be given to all the parts of a law the section *must be enforced unless either by express declaration or necessary implication, arising from the terms of the law, as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions of [1 U.S.C. § 109].* (Emphasis added.)

The Supreme Court's decision in *Hertz* sounds the same theme. In *Hertz*, the Court considered whether the general savings clause preserved the United States' authority to impose an inheritance tax when the testator died before the effective date of the repealing act (removing authority to collect the tax). 218 U.S. at 215, 30 S.Ct. at 623. The Court quoted the savings statute and then said: "This provision has been upheld by this court as a rule of construction applicable, when not otherwise provided, as a general saving clause to be read and construed as a part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress." *Id.* at 217, 30 S.Ct. at 624 (citations omitted). The Court next quoted the above language from *Great Northern Ry. Co.*, explained that the statute was applicable to "liabilities," including taxes, and then concluded: "Therefore we must take that general saving clause into consideration *as a part of the legislation* involved in the determination of whether a 'liability' had been incurred by the imposition of a tax prior to the act that destroyed the law under which it had been imposed." *Id.* at 218, 30 S.Ct. at 624–25 (emphasis added).

The Court in *Hertz* had responded earlier to its own rhetorical question whether Congress could have intended the result required by the Court's interpretation of the general savings statute—a response that serves to answer as well Judge SCHWELB's rhetorical question whether "the Council's perhaps accidental failure to include in the MMSAA an 'express provision' of the kind contemplated by the general savings statutes *automatically* dooms these defendants ... to [man-

These general statutes, therefore, cannot be flicked aside as though legislative intent can, and must, be divined without reference to them. We see nothing "express" in the effective date provision that would make this case any different from *Hurwitz* or from later federal cases tracking the Supreme Court's analysis in *Marrero.* In short, the repealing legislation adds nothing "express" (or necessarily implied, see *supra* note 44) that would preclude the general savings statutes from preserving the mandatory-minimum sentences in these cases.

We recognize the force in Justice Schaefer's observation that general savings statutes are not always salutary, let alone remembered by legislatures that fail to specify the reach of new legislation.

> The common-law rule operated unsatisfactorily.·... The reaction against the common-law rule took the form of generalized statements of legislative intention.... They produce their own anomalous results. When a newer social view decides that certain conduct is no longer to be punished, the general statute steps in and imposes the punishment fixed by an earlier generation.... Such a [savings] statute is at best the statement of a present legislature as to the intention of a future one. It is so easy to show that the statute, when applicable, has often been overlooked by lawyers and judges that it is hard to believe that legislators have always had it in mind. Without looking beyond our own borders, it is clear that here, at least, such a statute has not been an effective substitute for individualized statements of legislative purpose.

*People v. Bilderback,* 9 Ill.2d 175, 137 N.E.2d 389, 393 (1956) (applying general savings statute to preserve prosecution for felony rather than misdemeanor). But, as Justice Schafer himself recognized, this is not to say a general savings statute should not apply when, by its terms, the law clearly says it is to apply. *See id.*

If the Council had intended for the repeal of mandatory-minimum sentences to apply as soon as possible, then a 30–day period of Congressional review (or, for even more immediate application, emergency legislation) could have been accomplished. Further, if the Council had intended for the repeal of mandatory-minimum sentences to apply retroactively—to pending prosecutions, either pre-sentence or pre-final judgment—express language to that effect could have been included. *See Hertz,* 218 U.S. at 221, 30 S.Ct. at 626, *supra* note 44. None of this happened. The general savings statutes, therefore, including the District's own statute passed little more than four years earlier, preserve mandatory-minimum sentences in àll cases where the offense was committed before May 25, 1995.

## IV.

Appellant Holiday also contends the trial court erred in denying his motion for severance, in failing to instruct the jury about the relationship between the drug offenses and the weapons offenses, in admitting expert testimony on the relationship between weapons and illegal drugs, and in denying his motion for continuance after discovery of the government's alleged violation of Super.Ct.Crim.R. 16.

### A.

Officer Robert Washington testified at trial that on March 23, 1994, at approximately 7:25 p.m., he saw a man, later identified as Holiday, selling what appeared to be a small quantity of drugs to a woman driving a white car. Washington apparently did not see any weapon during Holiday's interaction with the woman. The woman then drove off and, about five minutes later, was stopped four or

datory-minimum sentences]." *Post* at 102–103 (emphasis in original). The Court in *Hertz* said:
> Now, did Congress intend to make such an unjust distinction as would result from such an interpretation of the saving clause in question as shall make the time limit for payment the test as to whether one tax shall be preserved and the other remitted in a situation otherwise identical?

> The saving clause does not in terms limit the right saved to a tax or duty which should be due and payable at the date of the repeal. *It is perhaps an obvious suggestion that if that had been the purpose of Congress, it would have been easy to make that purpose clear.*

*Hertz,* 218 U.S. at 221, 30 S.Ct. at 626 (emphasis added).

five blocks away by an arrest team responding to Washington's radio broadcast. Police recovered from the floor of the woman's car a white rock that field-tested positive for cocaine. The woman was placed under arrest.

When the woman drove away, Holiday entered a nearby apartment building. Officer Washington continued to watch the scene for another 45 to 60 minutes until he saw Holiday leave the building with two other men and enter a nearby car. Washington alerted another arrest team; he then pulled up next to the car where Holiday was seated. At the same time, approximately 8:30 p.m., two squad cars arrived. One pulled in front, and the other in back, of the car containing Holiday. As the squad cars were arriving, Washington saw Holiday leaning back, pulling a gun from his waistband, and setting it on the floor of the car. In a later search of the car, the police discovered a .9 millimeter semi-automatic handgun on the floor. The gun was loaded with black talon bullets; a second magazine containing 13 black talon bullets was found next to the gun. The police did not recover any drugs either from the car or from Holiday or any other person in the car. Holiday was then placed under arrest.

### B.

■ Holiday says the trial court erred in denying his motion for severance under Super.Ct.Crim.R. 14.[45] "Our standard of review of such rulings is abuse of discretion, and appellant must make a showing of compelling prejudice to show such error." *Gooch v. United States*, 609 A.2d 259, 264 (D.C. 1992). Such prejudice will not normally exist where the evidence of the offenses would be mutually admissible at separate trials or, in any event, is "separate and distinct, such that it would not be 'amalgamated in the jury's mind into a single inculpatory mass.'" *Gooch*, 609 A.2d at 265 (quoting *Winestock v. United States*, 429 A.2d 519, 527 (D.C.1981)).

■ The government argues that the weapons evidence and the drugs evidence are part of a single transaction or series of transactions and, accordingly, that the evidence of each is admissible to explain the other under the analysis we elaborated in *Toliver v. United States*, 468 A.2d 958 (D.C. 1983). In *Toliver*, where the appellant had been charged with possession of heroin, we sustained the trial court's admission of evidence of appellant's contemporaneous drug sales "to explain the immediate circumstances surrounding the offense charged." *Id.* at 960 (citations omitted). We recognized that evidence of other criminal activity under this "circumstances surrounding" rationale was technically "not other crimes evi-

---

**45.** At trial, counsel for Holiday sought severance of the offenses after the government had dismissed charges of distribution of cocaine while armed and possession of a firearm during a crime of violence (PFCV), but he did not claim that the remaining charges were improperly joined, because—to use his words—"they weren't." Holiday's counsel reasoned that "until the government dismissed the distribution while armed and possession of a dangerous—possession of a firearm, they were properly joined." It is not clear whether Holiday's trial counsel meant to raise a misjoinder argument in the trial court, and it is similarly unclear whether Holiday presents a misjoinder argument in his initial brief on appeal. The government contends that any misjoinder argument is barred. *See Brown v. United States*, 627 A.2d 499, 508 (D.C.1993) (defendant may not take one position at trial and contradictory position on appeal); *(Michael) Bell v. United States*, 332 A.2d 351, 352–53 (D.C.1975) ("As a general rule, where offenses in an indictment are misjoined and the accused does not timely object, the objection is lost on appeal"). *But see Taylor v. United States*, 603 A.2d 451, 455

(D.C.1992), *cert. denied*, 506 U.S. 852, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992) (ruling on untimely claim of misjoinder under plain error standard of review, notwithstanding government's "technically correct" argument that failure to make timely Rule 8 joinder objection amounted to waiver).

We need not decide, however, whether Holiday has presented a misjoinder argument for our review. Even if the offenses were misjoined, the misjoinder would have been harmless error because, as elaborated below, the drugs evidence and the weapons evidence were mutually admissible as inextricably intertwined *Toliver* evidence; the government's case was strong; the weapons and drugs evidence were sufficiently separate and distinct; and the trial court instructed the jury to consider the evidence of each count separately. *See Byrd v. United States*, 551 A.2d 96, 99–100 (D.C.1988) (despite presumption of prejudice when offenses are improperly joined, misjoinder may be harmless where evidence of each offense would be mutually admissible in separate trials).

dence because it is too intimately entangled with the charged criminal conduct" to make it so. *Id.* Such evidence does not really reflect "other" criminal conduct, *i.e.*, it is not evidence of separable criminal conduct that is not admissible unless it meets specified exceptions, is more probative than prejudicial, and is permitted only with a jury instruction limiting its use. *See Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). We therefore concluded in *Toliver* that, "where evidence of incidental, uncharged criminal conduct is inextricably intertwined with evidence of the charged offense, evidence of the uncharged criminal conduct is directly admissible without the necessity of a cautionary *Drew* instruction." *Toliver*, 468 A.2d at 961; *see also (John) Settles v. United States*, 615 A.2d 1105, 1109 (D.C.1992) (*Toliver* evidence admissible "without any substantive limitations on its use").

▮ While pressing the *Toliver* rationale to avoid severance of the gun and drug charges, the government argues, in the alternative, that even if the facts here do not reflect inextricable intertwining of the gun and drug evidence, the evidence of each offense would be admissible in a separate trial of the other under the *Drew* exceptions permitting use of other crimes evidence to show motive and identity. *See Drew*, 118 U.S.App. D.C. at 16, 331 F.2d at 90. For this reason, too, says the government, a severance was not warranted.[46] We are satisfied that the *Toliver* argument works for the government, and thus we proceed with that analysis without considering *Drew*.

▮ It is important to make clear, first, that *Toliver* itself and other cases that have applied it have dealt with the issue of admissibility of uncharged criminal activity in a case of another charged crime. In contrast, we consider here—for purposes of severance analysis—the admissibility of evidence of one charged crime in a trial with another charged crime. Thus, the question of inextricable linkage of the two for *Toliver* purposes is a question of mutual inextricable linkage—*i.e.*, linkage as seen from the perspective of each offense at the time it occurred—much like mutual admissibility under a *Drew* analysis. *See (Charles) Settles v. United States*, 522 A.2d 348, 355 (D.C.1987) (discussing mutual admissibility in misjoinder context). There is a significant difference, however. Under *Drew*, the mutual admissibility question focuses on particular exceptions to the rule barring other crimes evidence; under *Toliver*, the question is whether evidence of each charged crime is part of the "immediate circumstances surrounding" the other, such that the evidence reflects two transactions (or a series of transactions) so "intimately entangled" that, whether looked at from the beginning (drug sale) or the end (weapon offense) each criminal event is not clearly explainable to the jury without evidence of the other.

We begin our *Toliver* analysis by noting that this court has applied *Toliver* on occasion to uphold the admissibility of evidence of other criminal activity discovered during an arrest for the charge at issue. *See Hawkins v. United States*, 482 A.2d 1230, 1233 (D.C. 1984) (per curiam) (evidence of weapons police discovered under defendant's bed was admissible "to explain the circumstances surrounding the search and the arrest" when defendant was charged with possession of cocaine also discovered under defendant's bed); *see also Morrison v. United States*, 547

---

**46.** The government also contends that the weapons evidence was admissible in the drug case because the weapons evidence, as such, was not inherently "other crimes" evidence under *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). *See Jones v. United States*, 477 A.2d 231, 243 (D.C.1984) ("gun possession, without more, is not evidence of wrongful conduct"); *but see Johnson v. United States*, 596 A.2d 980, 986 (D.C.1991) ("assuming that possession of a .38 revolver like that at issue here would pass the threshold requirement that it constitutes evidence of crime or wrongdoing"); D.C.Code § 22–3204 (carrying pistol without a license).

Given our analysis, we do not decide whether the weapons evidence here might be admissible without reference to *Drew*. Cf. *Blakeney v. United States*, 653 A.2d 365, 369 (D.C.1995) (pager admissible as probative evidence that defendant was involved in illegal distribution of drugs in possession of cocaine with intent to distribute case); *Lewis v. United States*, 379 A.2d 1168, 1170–71 (D.C.1977) (admitting physical evidence in the form of a bottle cap "cooker" and syringe in prosecution for possession of heroin when, at the time *Lewis* was decided, possession of drug paraphernalia was not a crime).

A.2d 996, 998 (D.C.1988) (upholding admission of testimony about items stolen from Jeep in case charging receipt of Jeep itself as stolen property). The police had been waiting for Holiday to emerge from the building in order to arrest him on the drug charge; the weapon he happened to be possessing at the time of that arrest was therefore inextricably a part of his arrest for drugs and thus admissible in evidence under *Toliver* with respect to the drug charge.

As to admissibility of the drug evidence in the gun case, we note that evidence of earlier criminal activity has been held admissible under *Toliver*-type analysis to explain the circumstances leading up to an eventual arrest. *See (Joseph) Bell v. United States,* 677 A.2d 1044 (D.C.1996) (evidence of defendant's drug sales fifteen minutes before arrest admissible in trial for possession with intent to distribute cocaine); *Toliver,* 468 A.2d at 961 (evidence of defendant's drug sales admissible in trial for possession, but not sale, of heroin); *Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982) (police observation of apparent drug sales before appellant's arrest admissible in trial for possession, but not sale, of marijuana); *Day v. United States,* 360 A.2d 483, 485 (D.C.1976) (evidence that officers were arresting defendant for reported robbery admissible to explain events immediately preceding defendant's commission of charged assault on arresting officer). Accordingly, from the perspective of the gun charge, *Toliver* analysis will permit admission of the drug evidence unless its linkage is too attenuated, the concern to which we now turn.

The facts of this case are similar to those of *Joyner v. United States,* 540 A.2d 457, 459 (D.C.1988), where the court held that a charge of possession with intent to distribute heroin had been properly joined with charges of assault with intent to kill while armed, assault with a dangerous weapon, and carrying a pistol without a license—without prejudice necessitating severance. Joyner had pointed a gun at someone and pulled the trigger three times, although the gun had not fired. *Id.* at 458. Joyner fled but was stopped in the same vicinity soon thereafter by a police officer and was arrested. The police searched an area near where the altercation had occurred and found a pistol, a small change purse containing ten small packets of heroin, and a pink laundry slip with Joyner's name and address on it. Counsel for Joyner sought to sever the drug charge from the assault and weapon offenses. This court held:

> The mere fact that Joyner was not arrested until several *moments* later and a *very short distance* away from the Watson home under circumstances where the evidence could lead one reasonably to believe that he had just abandoned the two items of contraband and the laundry slip does not seem to us to be a rational basis to hold this joinder [of the drug offense with the others] improper. (Emphasis in original.)

*Id.* at 459. Although the evidence adduced at trial in *Joyner* did not establish that the possession of heroin with intent to distribute necessarily was part of a transaction that included the assault, weapon, and ammunition charges, this court held, in effect, that the heroin possession was temporally and geographically connected enough to the other charges to permit joinder under Super.Ct.Crim.R. 8(a). More significantly for our purposes, in response to Joyner's alternative contention based on Super.Ct.Crim.R. 14, this court found no prejudice warranting severance, apparently because the court (without citing *Toliver*) saw all the events as part of a whole that the jury needed to hear to understand the crimes charged.

■ Applying the kind of analysis spelled out in *Toliver,* we are satisfied that evidence of Holiday's drug offense was admissible to explain the circumstances of his arrest on the weapon charge, *see Day,* 360 A.2d at 485, just as we are persuaded that evidence of the weapon offense was inextricably a part of Holiday's arrest on the drug charge, *see Hawkins,* 482 A.2d at 1233. We recognize that the time differential between the two offenses—about an hour—distinguishes this case to some extent from *Joyner,* where the altercation and the discovery of drug evidence were but "moments" apart. Nonetheless, we conclude that the continuity of events here under the eye of a single police

officer provides the necessary nexus for applying *Toliver* to both offenses here. *See Croom v. United States,* 546 A.2d 1006, 1009 n. 5 (D.C.1988) (affirming admission of evidence of defendant's threatening conduct upon being confronted by victim and her mother the morning after events leading to charges of carnal knowledge and taking indecent liberties with a child occurred); *Tabron v. United States,* 410 A.2d 209, 214 (D.C. 1979) (evidence that defendant planned to rob drug store admissible to explain circumstances leading up to murder that took place at the drug store).[47] The trial court, moreover, explicitly found the joined evidence "more probative than prejudicial." *See Green,* 440 A.2d at 1007 (*Toliver* evidence admissible "when its probative value outweighs its prejudicial effect.").[48] We cannot disagree on this record. We must conclude that the trial court did not abuse its discretion in denying appellant's motion to sever the charges.

### C.

■ Holiday also argues that the trial court erred by failing to instruct the jury as to the limited purposes for admitting other crimes evidence. *See Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982) ("we generally have required the trial court, sua sponte if necessary, to instruct the jury as to the limited purpose for which [other crimes] evidence is admitted and for which it is to be considered"). Appellant did not request such an instruction at trial; we therefore review for plain error. *See Green,* 440 A.2d at 1008 n. 8.

Because we have ruled that the weapons evidence and the drugs evidence were both admissible under *Toliver,* appellant's argument must fail. *See Hazel v. United States,* 599 A.2d 38, 40 n. 4 (D.C.1991) ("evidence of other criminal activity to explain 'the circumstances immediately surrounding the charged offense' may be admitted without any cautionary instruction only when such activity is temporally proximate to the charged crime."); *Parker v. United States,* 586 A.2d 720, 724 n. 6 (D.C.1991) (quoting *Toliver,* 468 A.2d at 961 ("inextricably intertwined" evidence directly admissible without the necessity of cautionary *Drew* instruction.)).

### D.

■ Holiday next argues that the trial court erred in admitting expert testimony about the relationship between weapons and illegal drug sales. At trial, the government elicited expert testimony from Detective Stroud that "a lot of times drug dealers use weapons to protect their enterprise," and that "the most popular handgun used [by drug dealers] is the .9 millimeter semiautomatic. The weapon has a lot more stopping power. You can crack off more rounds. Sometimes as many as 20 rounds of ammunition can be fired before you have to reload again." Before Stroud took the stand, defense counsel objected to Stroud's testimony linking drugs and weapons.

"The trial court has broad discretion to admit or exclude expert testimony, and its decision either way will not be disturbed on appeal unless it is manifestly erroneous." *Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987) (citing *Ibn–Tamas v. United States,* 407 A.2d 626, 632 (D.C.1979), and *Douglas v. United States,* 386 A.2d 289, 295

---

**47.** This is not a case such as those referred to in *Parker v. United States,* 586 A.2d 720, 724–25 (D.C.1991), involving incidents taking place weeks or months before or after the charged offense. *See also Holmes v. United States,* 580 A.2d 1259, 1266–67 (D.C.1990); *Williams v. United States,* 549 A.2d 328, 332–33 (D.C.1988).

**48.** The potential prejudice from the risk that the jury would cumulate the evidence against the defendant was minimized by the court's instructing the jury as follows:

[E]ach charge is a separate count and you must return a separate verdict for each count, a separate *offenses* is charged in each one of the counts. Each offense and the evidence which applies to it should be considered separately and you should return separate verdicts as to each count.

The fact that you may find the defendant guilty or not guilty on any one count of the indictment should not control or influence your verdict with respect to any other count. *But see Parks v. United States,* 656 A.2d 1137, 1139 (D.C.1995) (joint trial of charges improper under "separate and distinct" theory where it is unlikely jurors could keep evidence of each charge separate in their deliberations, despite limiting instruction).

(D.C.1978)). The court has " 'frequently upheld the use of expert testimony to aid the jury's understanding of drug trafficking in the District.' " *Blakeney,* 653 A.2d at 369 (quoting *Griggs v. United States,* 611 A.2d 526, 527 (D.C.1992)). Expert testimony is admissible when it assists the jury in " 'understanding matters beyond the ken of the average lay[person].' " *Id.* (quoting *Griggs,* 611 A.2d at 528). The trial court ruled that the detective's testimony was relevant to prove intent to distribute and that "the relevant aspect of it clearly outweighs any prejudicial impact." *See Hinnant,* 520 A.2d at 294 (fact that appellant possessed a gun "when he was arrested also supports a finding of intent to distribute"). The trial court did not abuse its discretion in admitting the detective's expert testimony.

### E.

Finally, Holiday argues that the trial court erred in refusing to grant his request for a mid-trial continuance after discovering the government had failed to disclose a Metropolitan Police Department report on the results of a fingerprint examination of the gun and the magazine recovered in this case. The fingerprint report indicated that latent fingerprints had been lifted from the barrel of the weapon recovered but that the prints were "not good enough to be compared against another suspect."

■■■■ When the trial court finds, as Judge Canan did here, that a discovery violation has occurred, the court has broad discretion to fashion an appropriate sanction. *See Lee v. United States,* 385 A.2d 159 (D.C. 1978). "[A]mong the factors the trial court must consider and weigh are: (1) the reasons for the nondisclosure, (2) the impact of the nondisclosure on the trial of the particular case, and (3) the impact of the sanction on the proper administration of justice in general." *Id.* at 163 (citations omitted); *see also Washington v. United States,* 600 A.2d 1079, 1081 (D.C.1991) (per curiam). We will reverse an appellant's conviction only if the trial court abused its discretion in fashioning a remedy and the appellant's rights were substantially prejudiced. *See Washington,* 600 A.2d at 1081; *Lee,* 385 A.2d at 163–64.

Defense counsel requested an overnight continuance so that she would have an opportunity to review the fingerprint report and prepare adequate cross-examination of the fingerprint expert. The trial court denied counsel's request, allowing counsel instead to speak with the government's fingerprint expert over the lunch recess and precluding the government from introducing the fingerprint evidence in its case-in-chief.

■■■■ Assuming without deciding there was a Rule 16 violation here, we do not find an abuse of discretion. The trial judge, in his own words, sought "a proper balance to both sides, to allow both sides not to be unduly prejudiced by what [it] found in this case not to be a deliberate effort ... to frustrate either side." Furthermore, even if we believed the trial court abused its discretion—which we do not—we would conclude that Officer Washington's eyewitness testimony that he saw Holiday place the gun on the floor of the car, when coupled with the minimal exculpatory value of the fingerprint report, would demonstrate that appellant had failed to demonstrate prejudice to his substantial rights warranting reversal. *See Lee,* 385 A.2d at 164.

### V.

Appellant Park argues that the trial court abused its discretion in admitting hearsay testimony under the coconspirator exception. She also maintains that the mandatory-minimum sentencing regime is not rationally related to legitimate legislative goals, as applied to the facts of her case, and thus that her sentence is unconstitutional.

### A.

The government sought to prove at trial that Park and her husband conducted a cocaine distributing operation from their carryout store, the Fish Market, located near 9th and N Streets, N.W. The government presented evidence at trial that on June 24, 1993, Officer Phillip Burton, working undercover, met an individual later identified as Carl Hatchett near the Fish Market. Burton told Hatchett that he wanted to purchase a

"ten pack," meaning a bundle of ten vials of "Giorgio" brand cocaine powder. After consulting with another individual, Hatchett instructed Burton to wait in the alley and "not [to] buy from anyone else." Hatchet told Burton that Hatchett "had to go get it in the store." Another officer then saw Hatchett enter the Fish Market for less than a minute and return to the alley where Burton was waiting. Hatchett sold Burton ten vials of cocaine for $100.

A short time later, the police arrested Hatchett and executed a search warrant at the Fish Market. Police officers recovered (1) a bundle of ten vials of cocaine hydrochloride weighing 481 milligrams from Park's pocket, (2) a red plastic bucket bearing Park's fingerprints and containing 205 vials (approximately 12 grams) of cocaine, and (3) two stacks of cash, one of which contained a marked $20 bill that Burton had used in purchasing cocaine from Hatchett. Park testified that a customer had left the plastic bucket in the store and that she repeatedly but unsuccessfully had attempted to contact her husband to have him turn the contraband over to the police.

**B.**

Park argues, first, that the trial court abused its discretion by admitting Burton's testimony that Hatchett had told him Burton "had to go get it [the cocaine] in the store." A coconspirator's out-of-court statement is admissible nonhearsay in this jurisdiction[49] when the party seeking to introduce the statement establishes that (1) it is more probable than not a conspiracy existed, (2) the defendant had a connection to the conspiracy, and (3) the conspirator made the statements during the course of, and in furtherance of, the conspiracy. *See Bellanger v. United States*, 548 A.2d 501, 503 (D.C.1988) (per curiam); *Butler v. United States*, 481 A.2d 431, 439 (D.C.1984) *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985). The trial court's decision to admit coconspirator testimony as nonhearsay will be upheld absent an abuse of discretion. *See*

*Williams v. United States*, 655 A.2d 310, 315 (D.C.1995).

Before Burton took the stand, the trial court ruled that the statement was one of joint activity and was highly probative of the connection between the store and the items found during the search of the store. While acknowledging that the statement was somewhat prejudicial because Hatchett did not mention Park by name, the court concluded that the statement was "clearly admissible and clearly probative." We see no abuse of discretion in the trial court's ruling. *See Chavarria v. United States*, 505 A.2d 59, 62 (D.C.1986) (upholding admission of statement by nontestifying coconspirator advertising marijuana).

**C.**

Park next argues that the mandatory-minimum sentencing scheme is unconstitutional as applied to the facts of her case because it is not rationally related to any legitimate penological objective. Park points out that the statutory classification punishes first offenses of possession with intent to distribute (PWID) under 50 grams of powdered cocaine more severely than first offenses of PWID under 50 grams of crack cocaine. She then argues that this disparity is at odds with the rest of the sentencing scheme where the seller of crack cocaine is punished equally or more severely than the seller of powdered cocaine. This particular disparity, she says, reflects an irrationality that violates due process and equal protection of the laws.

Park acknowledges that a statutory classification that does not impinge on fundamental rights or involve a suspect class carries a strong presumption of validity. *See Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); *Backman v. United States*, 516 A.2d 923, 926 (D.C.1986) (per curiam) (rejecting constitutional challenge to distinction between addiction to heroin and addiction to cocaine for purposes of addict exception of D.C.Code § 33–541(c)(2)). The rational-basis test, ap-

---

**49.** This court has adopted FED.R.EVID. 801(d)(2)(E). *See Butler v. United States*, 481

A.2d 431, 439 (D.C.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985).

plicable here, "allows legislatures wide discretion in attacking problems in any rational manner." *Gibson v. United States,* 602 A.2d 117, 119 (D.C.1992) (rational basis test is standard applicable to equal protection challenges to sentencing classifications).

In adopting the "Omnibus Narcotic and Abusive Drug Interdiction Amendment Act of 1990," the Council created "a tiered system of penalties based on the number of convictions and the amount of drug involved" [50] to replace a system, originally adopted by citizen initiative, mandating minimum penalties for drug distribution without such differentiation.[51] First, the 1990 Act changed the definition of "narcotic" to include "cocaine, its salts, optical and geometric isomers, and salts of isomers." [52] That change alone "increase[d] the mandatory minimum for cocaine [powder] from 20 months to 4 years." [53] No one here contends that the Council lacked a rational basis for designating cocaine as a narcotic drug.

Next, the Council created a statutory distinction between major and minor drug dealers, with different penalties for each depending on the type of substance involved.[54] For most substances—*e.g.,* narcotics (including cocaine powder), phenmetrazine, and a PCP mixture—an individual became a major dealer if 500 or more grams were sold; for selling less, one would be a minor dealer.[55] But, for three drugs in particular—cocaine base (crack cocaine), pure PCP, and methamphetamine—one became a major dealer for selling only 50 or more grams; and, if selling under that, the seller was a minor dealer.[56]

Finally, the Council created a separate classification, carrying an additional year's mandatory-minimum penalty, for first and second offense minor powder cocaine distributions.[57] Accordingly, the penalty scheme created by the Council for distributions of cocaine base, cocaine powder, and other narcotic drugs [58] was:

Schedule I, II or III drugs, including cocaine powder).

50. COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 8–495, THE "OMNIBUS NARCOTIC AND ABUSIVE DRUG INTERDICTION AMENDMENT ACT OF 1990," at 2 (March 7, 1990) [hereafter DRUG REPORT].

51. DRUG REPORT at 2 (referring to the 30 "Mandatory–Minimum Sentences Initiative of 1981," D.C.Law 4–166, 30 D.C.Reg. 1083). The existing law did establish different mandatory-minimum penalties for different classes of substances—four years in prison for narcotic drugs, twenty months in prison for controlled or counterfeit substances classified in Schedule I, II or III, and one year in prison for controlled or counterfeit substances classified in Schedule IV or V. *See* "Mandatory-Minimum Sentences Initiative of 1981," D.C.Law 4–166, 30 D.C.Reg. at 1086 (effective March 9, 1983) (codified as D.C.Code § 33–541(c)(1) (1984 Supp.)).

52. The "Omnibus Narcotic and Abusive Drug Interdiction Amendment Act of 1990," D.C.Law 8–138, 37 D.C.Reg. 2638 (effective June 13, 1990) (codified at D.C.Code § 33–501(15)(D) (1993 Repl.)) [hereafter "1990 Act"].

53. DRUG REPORT at 3; see D.C.Code § 33–541(c)(1)(A) (1984 Supp.) (mandatory-minimum prison sentence of four years for narcotic drugs); *id.* § 33–541(c)(1)(B) (mandatory-minimum prison sentence of twenty months for non-narcotic

54. DRUG REPORT, at 3.

55. 1990 Act (codified at D.C.Code § 33–541(c)(1)(A)–(A–3) (1993 Repl.)).

56. 1990 Act (codified at D.C.Code § 33–541(c)(1)(A) (1993 Repl.)).

57. Judge SCHWELB's suggestion, *post* at 108, that the additional year penalty for minor cocaine powder offenses may have been a "mistake" is refuted by specific references to the increased penalty for minor cocaine offenses in the legislative history. *See* DRUG REPORT at 3 ("Bill 8–495 goes further by increasing the mandatory minimum for cocaine to 5 years for a first offense, 8 years for a second offense, and 10 years for a third or subsequent offenses"); *see also* The "Omnibus Narcotic and Abusive Drug Interdiction Amendment Act of 1990," D.C.Law 8–138, 37 D.C.Reg. at 2641 (codified at D.C.Code § 33–541(c)(1)(A–2)(ii) (1993 Repl.)).

58. A separate category provides a twenty month mandatory-minimum penalty for distributions of other schedule I, II or III drugs, and a one year mandatory-minimum penalty for distributions of other schedule IV or V drugs. D.C.Code § 33–541(c)(1) (1993 Repl.).

| | Cocaine Base | Cocaine Powder | Other Narcotics |
|---|---|---|---|
| | **Major Dealer** (50+ grams) | **Major Dealer** (500+ grams) | **Major Dealer** (500+ grams) |
| 1st offense | 5 years | 5 years | 5 years |
| 2nd or subsequent offense | 10 years | 10 years | 10 years |
| | **Minor Dealer** (Under 50 grams) | **Minor Dealer** (Under 500 grams) | **Minor Dealer** (Under 500 grams) |
| 1st offense | 4 years | 5 years | 4 years |
| 2nd offense | 7 years | 8 years | 7 years |
| 3rd or subsequent offense | 10 years | 10 years | 10 years |

Park argues the statute is unconstitutional as applied to cases, such as hers, involving fewer than fifty grams of a controlled substance. Park compiles an impressive array of authorities that sustain imposition of longer sentences for distributing crack cocaine than for distributing an equal amount of powdered cocaine. She also points out that 21 U.S.C. § 841 (1994) imposes a substantially higher prison term for distributing crack cocaine than for distributing an equal amount of powdered cocaine. *See United States v. Cyrus*, 281 U.S.App.D.C. 440, 443, 890 F.2d 1245, 1248 (1989) (upholding mandatory sentence of ten years for distributing crack cocaine although appellant most likely would have received sentence of two or three years for distributing an equal amount of powdered cocaine). Further, the federal sentencing guidelines treat one gram of cocaine base as equivalent to 100 grams of powdered cocaine for sentencing purposes. *See United States v. Lawrence*, 951 F.2d 751, 753 (7th Cir.1991). Park then cites state laws to establish that thirteen states punish one for selling crack cocaine more severely than for selling powdered cocaine, while the remaining thirty-seven states punish the two types of cocaine equally. Park contends that even under District of Columbia law, distribution of crack cocaine—for all amounts over fifty grams—is punished equally with, or more severely than, distribution of an equal amount of powdered cocaine. Drawing on these authorities, Park concludes that punishing the distribution of fewer than fifty grams of powdered cocaine more harshly than punishing the distribution of an equal amount of crack cocaine is an anomaly for which there can be no rational basis.

No one seriously could suggest that the respective mandatory-minimum punishments for selling small amounts of powdered cocaine and crack cocaine—looked at separately—are unconstitutional. Neither is irrational in isolation. For this reason alone we cannot say that the decision to punish more heavily for sales of powdered cocaine in certain amounts than for sales of crack cocaine in those same amounts lacks a rational basis; a legislature is not obliged to justify punishment for one crime by reference to punishment for another. As the federal courts have noted when responding to similar challenges to the federal sentencing guidelines:

Political decisions may be harsh yet within the bounds of power. The Constitution does not compel Congress to adopt a criminal code with all possibility for unjust variation extirpated. Experience with the guidelines suggests the reverse: Every attempt to make the system of sentences 'more rational' carries costs and concealed

irrationalities, both loopholes and unanticipated severity. Criminals have neither a moral nor a constitutional claim to equal or entirely proportional treatment.

*United States v. Marshall*, 908 F.2d 1312, 1325–26 (7th Cir.1990); *see also United States v. Holland*, 810 F.2d 1215, 1219 (D.C.Cir.1987) ("equal protection of the laws does not require Congress in every instance to order evils hierarchically according to their magnitude and to legislate against the greater before the lesser"). Nor is the Council required to rewrite the criminal code when deciding to impose harsher penalties for what it rationally perceives as a particularly vexing crime.

The Council's decision to punish what it deemed minor powder cocaine sales more harshly than any other minor drug sales—including crack cocaine—does not invalidate the statutory scheme. While not perfectly symmetrical, the scheme is rationally related to legitimate penological objectives. The crime of possession with intent to distribute a given amount of powdered cocaine is punished less severely than possession with intent to distribute an equal amount of crack cocaine in some circumstances; and it is punished equally with distribution of the same amount of crack cocaine in other circumstances. The fact that possession with intent to distribute powdered cocaine happens to be punished more severely than possession with intent to distribute crack cocaine in still other circumstances does not make the statute unconstitutional as applied to Park. In addressing practical problems, the legislature may make "rough accommodations." *Metropolis Theater Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913), *quoted in Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). "Perfection in making the necessary classifications is neither possible nor necessary." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam).

■ In any event, the government proffers a rational basis for the reverse statutory distinction Park complains of here in cases involving less than fifty grams of cocaine: Given that cocaine base [*i.e.,* crack cocaine] is more addictive than cocaine powder (*see* Brief for Appellant at 22–23), the Council rationally could have believed that small dealers in cocaine powder are less likely than small dealers in cocaine base to be addicts who sell simply to support their habits. Thus, the Council could conclude, low-level dealers in cocaine base generally do not deserve the more severe punishment due low-level dealers in cocaine powder.

While this justification for more severe statutory punishment for selling under fifty grams of cocaine powder than for selling a like amount of crack cocaine seems strained, this court cannot say it is altogether irrational. Federal cases upholding harsher penalties for crack cocaine reason that crack cocaine is cheap, popular, and addictive. While it is certainly legitimate for a legislature to choose to "combat the devastating effects of crack cocaine on our society," *Lawrence*, 951 F.2d at 755, by keeping "minor" crack dealers off the streets for significant periods of time, we do not believe the Constitution requires the Council to adopt a crime-fighting approach identical to that adopted in other jurisdictions. It is not surprising, nor does it violate the Constitution, for legislative bodies to attempt diametrically opposed, but rationally based, solutions to a particular social problem. The Constitution requires only that the statutory distinction be supported by at least one "state of facts either known or which could reasonably be assumed," *Backman*, 516 A.2d at 927 (*quoting United States v. Thorne*, 325 A.2d 764, 766 (D.C.1974) (*quoting United States v. Carolene Products Co.*, 304 U.S. 144, 153–54, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938))); *see also F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 314–16, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993). Thus, the distinction need only be hypothetically rational, not necessarily based on a rational judgment actually made by the Council. We conclude that the sentencing scheme of the former D.C.Code § 33–541(c) meets this constitutional test. Accordingly, we decline Park's invitation to fine-tune the Council's rational classification scheme; we uphold the constitutionality of the statute as applied to the facts here.

**90**

## VI.

In summary, these consolidated cases result in the following rulings: (1) the petitions for writ of mandamus in the two *Edwards* cases are dismissed without prejudice to the right of the government to seek correction of illegal sentences pursuant to Super.Ct.Crim.R. 35 in light of our decisions in the two direct appeals, *Holiday* and *Park;* (2) pursuant to the federal general savings statute, 1 U.S.C. § 109, and to the District of Columbia general savings statute, D.C.Code § 49–304(a), mandatory-minimum sentencing is required in all cases of offenses committed before May 25, 1995, the effective date of the statute repealing mandatory-minimum sentences; (3) the trial court did not abuse its discretion in denying Holiday's motion for severance, and did not commit reversible error in admitting expert testimony, in declining to instruct the jury on the limited use of other crimes evidence, and in denying Holiday's request for a continuance in response to the government's alleged violation of Super.Ct.Crim.R. 16; therefore, Holiday's convictions are affirmed; and (4) the trial court did not commit reversible error in admitting nonhearsay statements of an alleged coconspirator, and the sentencing structure of former D.C.Code § 33–541(c), as applied to the facts of Park's case, is constitutional; Park's conviction, therefore, is affirmed.

*So ordered.*

### Postscript in Response to Dissent

Judge Schwelb, in dissent, stresses the devastating impact of "lengthy prison sentence[s] which [the defendants do] not deserve" on parents of small children, on racial and ethnic minorities, and on persons dying of AIDS or other medical conditions. *Post* at 97 n. 11. Criminal conduct often brings tragedy, both for the individuals involved and for the community as a whole. But to achieve the result Judge Schwelb calls for, this court would have to ignore the law in effect at the time these crimes were committed, excuse the ambiguous language of the statute that repealed mandatory-minimum sentencing, overlook the general savings statutes enacted by Congress and by the Council of the District of Columbia to fill in the gaps caused by such ambiguity, and dismiss the fact that all four of these appellants were convicted—fairly—of contributing to the drug problem that plagues the city. It is the Council's role to decide what the laws—including their effective dates—will be, and it is this court's role to apply laws as the Council has written them, not as we would have had the Council write them, or have written them ourselves, in hindsight. We can no more decide to apply a law before it becomes effective than we can decide not to apply a law after it becomes effective.

Judge Schwelb denigrates use of the federal general savings statute as, in effect, an anomaly adopted "a century and a quarter ago." *Post* at 104. The fact is, of course, that the Council itself adopted the local savings statute—equally applicable here (Judge Schwelb agrees)—in 1990, only four-plus years before the Council repealed mandatory-minimum sentencing.[59] Seven members—a majority—were on the Council for both legislative decisions.[60] Furthermore,

59. The Council considered and adopted the repeal of mandatory-minimum sentencing at the end of 1994. *See* 42 D.C.Reg. 2843 (June 9, 1995) ("District of Columbia Nonviolent Offenses Mandatory–Minimum Sentences Amendment Act of 1994" was adopted on first and second readings on November 1, 1994, and December 6, 1994, respectively, signed by the Mayor on December 28, 1994, transmitted to both Houses of Congress for its review, and became effective May 25, 1995).

The Council took action on the D.C. savings statute—in its emergency, temporary, and final forms—throughout the first half of 1990. *See* 37 D.C.Reg. 4827, 4828 (July 27, 1990) (emergency act became effective on January 26, 1990; temporary act was adopted on first and second readings on January 16, 1990 and January 30, 1990, respectively, signed by the Mayor on February 18, 1990, it was assigned Act No. 8–156 and transmitted to both Houses of Congress for its review; "District of Columbia Statutory Savings Provision Act of 1990" was adopted on first and second readings on June 12, 1990, and June 26, 1990, respectively, signed by the Mayor on July 12, 1990, and became effective September 26, 1990).

60. The Council of the District of Columbia consists of thirteen members. *See* D.C.Code § 1–221(b)(1) (1992 Repl.). Seven persons were members in both 1990 and 1995, namely, David A. Clarke, John Ray, Hilda H.M. Mason, William Lightfoot, Frank Smith, Charlene Drew Jarvis, and Harry Thomas, Sr. *See* District of Columbia Board of Elections and Ethics, Historical Listing of Elected Officials Since Home Rule (July 16, 1996) (unpublished, on file with the Board of Elections and Ethics).

the Council's decision to adopt language that is functionally equivalent to the federal statute, but different in wording, shows more than passing attention to the subject. *Compare* D.C.Code § 49–304(a) *with* 1 U.S.C. § 109. We therefore cannot accept our colleague's argument that the Council should be deemed *not* to have had the general savings statute in mind when it repealed mandatory-minimums without specifying which of the several possible classes of defendants the repealer should affect. See *supra* Part III. D.(3). Under the circumstances, we have to presume the Council knew what it was doing in declining to provide language in the repealer that negates the general savings statutes.

The majority approach accordingly differs from that of our colleague in two key respects. First, Judge Schwelb argues that the Council, in repealing mandatory-minimum sentencing, did not trigger the general savings statute because the repealer did not "release or extinguish" a penalty. Second, he argues that even if a penalty was released or extinguished, the Council of the District of Columbia—although not "expressly" saying so—intended the repealer to apply retroactively, *i.e.,* to affect all pending cases, rather than having the repealed legislation (preserved by the general savings statutes) apply.

As elaborated earlier, our colleague is wrong in his first conclusion because of Supreme Court (*Marrero*) and succeeding federal circuit court (*Jacobs; Cook*) authority to the contrary. He errs in his second, fallback argument both because the Council's repealer did not satisfy the requirement of an "express" provision to negate application of the general savings statutes and because, in any event, the Council's intent—prospective or retroactive application of mandatory minimum sentencing?—is not clear. Even if we were inclined to do so, this court cannot supply a legislative intent that, to this day, is not discernible but for the general savings statutes enacted by Congress—and by the Council itself in 1990—to govern the very

kind of situation at issue here. It therefore follows, ineluctably, that the federal and local general savings statutes, 1 U.S.C. § 109 and D.C.Code § 49–304(a), preserve for the defendants here the mandatory-minimum sentencing provisions in effect when the defendants' crimes were committed.

SCHWELB, Associate Judge, concurring in part and dissenting in part:

One of the wisest exponents of our judicial craft cautioned more than eighty years ago that "[statutes] should be construed, not as theorems of Euclid, but with some imagination of the purposes which lie behind them." *Lehigh Valley Coal Co. v. Yensavage,* 218 F. 547, 553 (2d Cir.1914), *cert. denied,* 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434 (1915) (Learned Hand, J.) (quoted in *Luck v. District of Columbia,* 617 A.2d 509, 513 n. 4 (D.C.1992)). Unfortunately, my colleagues in the majority have not heeded Judge Hand's precept. Instead, they have treated the principal issue before us rather like a problem in algebra, and they have made no inquiry into the consequences of their decision or into whether the Council which enacted the legislation in question could really have intended these consequences.

The practical result of the majority's construction of the Mandatory Minimum Sentences Amendment Act (MMSAA),[1] D.C.Law 10–258, 42 D.C.Reg. 238 (effective May 25, 1995), will be that the defendants in these cases, as well as an unknown but substantial number of other persons, will be required to serve harsh mandatory minimum sentences without any consideration of each defendant's individual circumstances. The majority so holds in spite of the fact that prior to the imposition of sentence in these cases, the Council of the District of Columbia had concluded, on the basis of a compelling legislative record, that mandatory minimum sentences were excessive for and unjust to some of the non-violent drug offenders who were being subjected to them.

It is our responsibility to ensure that men or women are not sent to prison, or kept

---

1. The full name of the statute is "District of Columbia Nonviolent Offenses Mandatory–Minimum Sentences Amendment Act of 1994." The reader will perhaps forgive the abbreviated acronym.

there, unless such incarceration clearly and unambiguously reflects the legislative will. *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (citations omitted). I am satisfied that the Council never intended to compel a judge to impose a mandatory minimum sentence, after the effective date of the MMSAA, on any defendant who, in the judge's opinion, does not deserve such a sentence. Moreover, in my view, the federal and District of Columbia general savings statutes on which the majority relies are inapplicable to the MMSAA, because the MMSAA did not release or extinguish any penalties, but simply provided judges with additional sentencing options. I am also satisfied that these savings statutes were not intended to override the Council's ameliorative legislative intent in enacting the MMSAA. Accordingly, I respectfully dissent from Part III of the majority opinion.

My colleagues discern a constitutionally sufficient "rational" basis for sentencing Ms. Jae Hoa Park to a mandatory minimum term of five years for possessing powdered cocaine with intent to distribute it (PWID), when the mandatory term would have been only four years if the drug in question had been "crack" cocaine—a far more addictive and dangerous drug. I am no apostle of judicial activism, but I do not see how we can justify keeping Ms. Park in prison for an extra year when the harsher punishment for powdered cocaine is patently irrational and was most probably placed in the statute by mistake. Accordingly, I also dissent from Part V C of Judge Ferren's opinion for the court. I join the remainder of his opinion.

## I.

### THE MANDATORY MINIMUM SENTENCING ISSUE

#### A. The MMSAA.

The past is prologue. "[E]very statute must be construed with reference to the original intent and meaning of the makers, which intent and meaning may be collected from the cause or necessity of the enactment, and the objects intended to be accomplished by it." *Ex parte Redmond,* 3 App.D.C. 317, 318 (1894).

There is no better key to a difficult problem of statutory construction than the law from which the challenged statute emerged. Remedial laws are to be interpreted in the light of previous experience and prior enactments.

*United States v. Congress of Indus. Orgs.,* 335 U.S. 106, 112–13, 68 S.Ct. 1349, 1352–53, 92 L.Ed. 1849 (1948). Because this case turns on the Council's intent in enacting the MMSAA, a few words are in order regarding the circumstances which led to the passage of this legislation.

In the autumn of 1982, the citizens of the District of Columbia were "in an angry frame of mind" towards drug dealers and armed criminals. *Lemon v. United States,* 564 A.2d 1368, 1379 (D.C.1989). On September 14 of that year, by a vote of 72% to 28%, they adopted an initiative providing, *inter alia,* for mandatory minimum penalties for defendants who distributed controlled substances or who possessed such substances with the intent to distribute them. *See* D.C.Law 4–166, §§ 9 & 10, 30 D.C.R. 1082 (Mar. 9, 1983), codified in D.C.Code § 33–541(e) (1993) (repealed by the MMSAA). The mandatory minimum sentencing scheme for which the voters cast their ballots was obviously designed to ensure that drug dealers would be severely punished. Judges were to be precluded from thwarting the popular will by exercising excessive leniency.

It soon became apparent, however, that the new statute would not bring about the consistency and severity in sentencing that its proponents may have anticipated. Because a defendant had no incentive to plead guilty if his sentence was pre-ordained, prosecutors routinely "sweetened the pie." They permitted many drug traffickers to plead guilty to "attempted distribution," or even to "attempted possession with intent to distribute," where the evidence showed that the "attempt" was actually a completed act. *See, e.g., United States v. Rogers,* 115 Daily Wash.L.Rptr. 221 (D.C.Super.Ct. Feb. 4, 1987). The mandatory sentences for which citizens had voted were not applicable to "attempts," *id.,* and many drug dealers thus continued to escape serving mandatory minimum time.

One consequence of the introduction of mandatory minimum sentences was that the discretion in sentencing previously exercised by judges was now exercised by prosecutors in their charging and plea-bargaining decisions. Many drug dealers received sentences far less severe than the mandatory minimum because prosecutors simply charged them with, or permitted them to plead guilty to, less serious offenses. Those defendants who went to trial and were convicted, however, necessarily received mandatory minimum sentences, even where a particular defendant's role in the distribution scheme was relatively minor.

In March 1994, Councilmembers William P. Lightfoot and Harry L. Thomas introduced Bill No. 10–617, in which they proposed, among other things, to repeal mandatory minimum sentences for unarmed drug offenders. The bill was referred to the Council's Committee on the Judiciary, which received testimony and other evidence from a substantial number of witnesses, most of whom focused on the injustices which were said to have characterized the eleven-year regime of mandatory minimum sentencing.

The testimony of Mary Jane DeFrank, a representative of the American Civil Liberties Union, was evidently quite influential with the Council.[2] Ms. DeFrank testified that after mandatory minimum sentences became the "weapon of choice" in the "war on drugs," "justice became a casualty in the process." She quoted Chief Justice Rehnquist to the effect that federal mandatory minimum sentences "impose unduly harsh punishment for first time offenders—particularly for 'mules' who play only a minor role in drug distribution schemes."[3] Ms. DeFrank told of a number of specific cases, in the District and elsewhere, in which disproportionately harsh sentences had caused extreme hardship to individual defendants and their families.

Other witnesses described in detail the effect of mandatory minimum sentences on women and children[4] and on racial and ethnic minorities.[5] Noting that the District has the highest *per capita* incarceration rate in the United States, the executive director of the D.C. Prisoners' Legal Services Project described the serious overcrowding of our prisons which has resulted from the influx of non-violent drug offenders. He especially emphasized the impact of mandatory minimum sentences on prisoners with medical problems.[6] Judge Henry F. Greene of the Superior Court testified that many individuals were effectively coerced into pleading guilty because "only those defendants coura-

2. Some of the language in the Judiciary Committee's Report was taken verbatim from Ms. DeFrank's testimony.

3. Ms. DeFrank also quoted a statement by Justice Kennedy to a Congressional subcommittee in which he agreed "with most judges in the federal system in the view that mandatory minimums are imprudent, unwise, and often an unjust mechanism for sentencing."

4. A representative of the Women in Prison Project of the National Women's Law Center testified, in part, as follows:
 The imposition of mandatory minimums on female drug offenders has a devastating, long-lasting impact on the stability of families in the District of Columbia, and places a tremendous strain on our already overburdened child welfare system.... Currently, countless children are left permanently scarred when they are separated from their mothers for long periods of time, and are shuffled about an overburdened and often insensitive child welfare system. Repealing mandatory minimum laws for drug offenses will minimize these scars, and help keep families together.

5. A repeated theme of the testimony of the proponents of the MMSAA was that mandatory minimum sentences were disproportionately applied to members of racial and other minorities. The Director of the Public Defender Service (PDS) revealed, for example, that in 1993, the overwhelming majority of drug arrests were made in predominantly black residential areas, and that *there was only one arrest for crack cocaine in predominantly white Ward 3* out of a total of 1894.

6. The witness told the Council that
 [u]nder the current law, prisoners who are dying of AIDS or other conditions while serving a mandatory minimum sentence for a non-violent offense, must die in prison. Dozens of prisoners who pose no threat to the community have been denied release under the medical parole program solely because they are serving a mandatory minimum sentence. This is both enormously costly to the District and cruel to these prisoners and their families.

geous—or foolhardy—enough to assert their constitutional right to a jury trial at the risk of receiving a mandatory minimum sentence of at least four years if convicted choose to reject a government plea offer...."

The members of the Council were also aware that, if the MMSAA was enacted, those drug dealers who merited severe punishment would not escape it. As the Director of the PDS explained, the proposed legislation

> does not eliminate stiff mandatory sentences for crimes of violence, or even drug offenses committed while armed with a gun.
>
> [I]t does not prevent District of Columbia Superior Court judges from imposing long sentences for drug offenses in appropriate cases. Judges retain the power to impose sentences which require the defendant to serve as much time as the current mandatory minimum sentences, or even longer. If the proposed legislation were adopted, a judge could still sentence a person convicted of a felony drug offense to a maximum term of as much as thirty years.

The problem, as perceived by a number of the witnesses before the Council, was that under then existing law, defendants whose role in the distribution of drugs was minimal were nevertheless subject to unreasonably harsh (for them) mandatory minimum penalties.

United States Attorney (formerly Superior Court Judge) Eric H. Holder, Jr. testified that although he had "previously expressed some reservations with regard to the wisdom of mandatory minimum sentences in drug cases for low-level street dealers," he had come to believe that the existence of such sentences "forces defendants to consider seriously the possibility of early treatment as an alternative to trial." Judge Holder suggested that "[i]f changes are to be made, we believe that only the length of those sentences should be examined." A representative of the Office of Corporation Counsel also opposed "the wholesale elimination of all mandatory minimum penalties for drug dealing regardless of the seriousness of the offense...."

On October 26, 1994, the Judiciary Committee issued its Report on the proposed legislation. Quoting extensively from the testimony of the ACLU representative, the Council stated that

> [t]hese [mandatory minimum] sentences take away the discretionary power of judges. Judges are thus forced to impose *harsh mandatory sentences on undeserving individuals without the latitude to consider a defendant's background, individual culpability, or likelihood of recidivism*—facts which could support a lesser sentence. Some judges have resorted to refusing to hear drug cases because they cannot conscionably sentence a first-time offender to a lengthy prison term.
>
> Another problem is the use of mandatory-minimum sentences as a threat by prosecutors to get defendants to plead to a lesser offense. A defendant charged with a non-violent drug offense who asserts his or her right to a jury trial does so at the risk of serving [a minimum of] four to ten years in jail if convicted. The discretion in sentencing rests with the prosecutor, not the judge.
>
> Additionally, mandatory-minimum sentences result in a large percentage of the District's youth being locked up for long periods of time at great expense to the District.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY REPORT ON BILL NO. 10–617 at 1 (Oct. 26, 1994) (emphasis added).

Apparently in response to the views of the United States Attorney and the Corporation Counsel, the Judiciary Committee recommended that mandatory minimum sentences be shortened rather than eliminated. The Council, however, rejected this compromise, and voted instead to abolish such sentences altogether for unarmed drug offenders. As enacted, Section 3 of the MMSAA simply states that D.C.Code § 33–541(c), which prescribed mandatory minimum sentences, "is repealed." Section 4 provides that the Act shall take effect following Congressional review and after publication in the District of

Columbia Register. The MMSAA became effective on May 25, 1995.[7]

### B. The Council's Intent.

In the context of the history described above, I now turn to the decisive task before us, namely, to ascertain whether the Council intended, in enacting the MMSAA, to require judges to impose on the defendants in these cases the mandatory minimum sentences required by statutory provisions which it had evidently found to be unjust and discriminatory, and which it had therefore repealed. "The paramount rule in construing statutes is to give effect to the intention of the [l]egislature." *Janof v. Newsom,* 60 App.D.C. 291, 293, 53 F.2d 149, 151 (1931).

In ascertaining legislative intent, we must first look to the words which the Council used, for "the proposition that plain statutory language generally trumps other considerations is hardly subject to challenge." *Luck, supra,* 617 A.2d at 512. "The literal words of [the MMSAA] are to be read in the light of the purpose of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *Metzler v. Edwards,* 53 A.2d 42, 44 (D.C.1947) (footnotes omitted).

Because the MMSAA states that its provisions shall become effective upon publication in the Register (which occurred on May 25, 1995), and because each of these defendants was sentenced after that date, the statutory language, read literally, supports the defense claim that the new sentencing options approved by the Council were available to each trial judge at the time of sentencing.

> [W]here an ameliorative statute takes the form of a reduction of punishment for a particular crime, the law is settled that the lesser penalty may be meted out in all cases decided after the effective date of the enactment, even though the underlying act may have been committed before that date.

*People v. Oliver,* 1 N.Y.2d 152, 151 N.Y.S.2d 367, 373, 134 N.E.2d 197, 201 (1956) (Fuld, J.).

There can be no doubt, in light of the statutory language and history which I have recited, that the MMSAA was ameliorative in character. Although, under the new statute, trial judges retained the authority to impose the harsh sentences previously mandated by law, the MMSAA provided them with alternative sentencing options for those defendants whose individual level of culpability and other circumstances, in the judge's view, made less severe punishment appropriate. The Council, in other words, found the indiscriminate imposition of mandatory minimum sentences for *every* defendant to be unjust, and it replaced mandatory sentencing with a more flexible approach under which the sentencing judge may exercise his or her discretion to impose a lesser penalty where an individual defendant deserves one.

If the basic purpose of the MMSAA was ameliorative—and the majority does not contend otherwise—it strikes me as patently incongruous to suggest that the same Councilmembers who found the mandatory sentences unfair to some defendants nevertheless intended to *require*—not permit, but *require*—trial judges to continue to impose such sentences after the effective date of the Act, without permitting any inquiry into whether an individual defendant merited more lenient treatment. My colleagues, armed with what they regard as the dispositive general savings statutes, have barely paused to inquire *why* humane and fair-minded legislators, who had enacted an ameliorative law in order to do away with what they obviously perceived to be an unjust and discriminatory *status quo,* would nevertheless insist that potentially unfair sentences *must* continue to be imposed on persons in the position of these defendants, and also on similarly situated defendants who had AIDS, or whose families were in distress, or who would otherwise suffer undeserved hardship.[8]

---

**7.** As the majority points out, there is a single reference in the Judiciary Committee Report to "reducing mandatory-minimums for non-violent offenders charged after the effective date of the Act." I agree with my colleagues that this allusion, which refers to a version of the bill rejected

by the Council, is inconclusive with respect to the issue before us.

**8.** Moreover, in case of doubt as to the meaning of the MMSAA, we should apply the rule of lenity, which "applies not only to interpretations of the

The majority's approach effectively rejects the validity of a common-sense proposition which distinguished judges in other jurisdictions have endorsed as obvious. As the Supreme Court of California explained in *In re Estrada*, 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 (1965),

> [w]hen the Legislature amends a statute so as to lessen the punishment *it has obviously expressly determined that its former penalty was too severe* and that a lighter punishment is proper as punishment for the commission of the prohibited act. *It is an inevitable inference that the Legislature must have intended that the* new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.

*Id.* at 175, 408 P.2d at 951 (emphasis added); *accord, State v. Pardon,* 272 N.C. 72, 157 S.E.2d 698, 702 (1967) (quoting *Estrada*). The New York Court of Appeals has likewise found it *"safe to assume,* as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts," regardless of when the underlying offense was committed. *Oliver, supra,* 151 N.Y.S.2d at 373, 134 N.E.2d at 202 (emphasis added); *accord, Pardon, supra,* 157 S.E.2d at 702 (quoting *Oliver*). In the present case, the inference that the Council intended these defendants to enjoy the benefits of the MMSAA is just as "obvious" and "inevitable" as in *Estrada* and just as "safe" as in *Oliver.* *See also State v. Macarelli,* 118 R.I. 693, 375 A.2d 944, 947 (1977) (holding that refusal to apply ameliorative change to defendant whose case has not been reduced to final judgment "would amount to nothing more than arbitrary retribution *in contravention*

*of the obvious legislative purpose behind the mitigation of the penalty ").* (Emphasis added).

A substantial number of the highest courts of other jurisdictions have adopted the views expressed in *Estrada, Oliver, Pardon,* and *Macarelli,* namely, that legislators who have enacted ameliorative changes in sentencing statutes intended these changes to apply, at least, to all defendants sentenced after the effective date of the new provisions. *See, e.g., People v. Schultz,* 435 Mich. 517, 460 N.W.2d 505, 511 (1990); *People v. Behlog,* 74 N.Y.2d 237, 544 N.Y.S.2d 804, 806–07, 543 N.E.2d 69, 71 (1989); *State v. Cummings,* 386 N.W.2d 468, 471–72 (N.D.1986); *State v. Tapp,* 26 Utah 2d 392, 490 P.2d 334, 335–36 (1971).[9] The basis for adopting that reasoning is obvious: the legislature is presumed to have acted rationally, and there is no legitimate reason for continuing to impose penalties which the legislature has rejected as excessive or unfair. As Judge Fuld stated for the court in *Oliver,*

> According to [modern] theories [of criminal justice], the punishment or treatment of criminal offenders is directed toward one or more of three ends: (1) to discourage and act as a deterrent upon future criminal activity, (2) to confine the offender so that he may not harm society and (3) to correct and rehabilitate the offender.... A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance.[10]

---

substantive ambit of criminal prohibitions, but also to the penalties they impose." *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (citations omitted). "This policy [of lenity] embodies the instinctive distaste against men [and women] languishing in prison *unless the lawmaker has clearly said they should." Bass, supra,* 404 U.S. at 348, 92 S.Ct. at 523 (emphasis added; internal quotation marks omitted) (quoting H. FRIENDLY, *Mr. Justice Frankfurter and the Reading of Statutes,* in BENCHMARKS 196, 209 (1967)); *Luck, supra,* 617 A.2d at 515. Mandatory minimum statutes restrict a

judge's traditional sentencing discretion, and the application of the rule of lenity is especially appropriate in construing such enactments. *See Dupree v. United States,* 583 A.2d 1000, 1004 n. 5 (D.C.1990); *id.* at 1004–05 (concurring opinion).

9. Other authorities to the same general effect are cited in Part II B of the majority opinion.

10. Fashions change, in criminal justice as in millinery, and retribution is more in vogue today than it was forty years ago. Obviously, however,

151 N.Y.S.2d at 373, 134 N.E.2d at 201–02; *accord, Macarelli, supra,* 375 A.2d at 947 (quoting *Oliver* ); *Estrada, supra,* 48 Cal. Rptr. at 176, 408 P.2d at 952 (same).[11]

Requiring trial judges in these cases to impose mandatory minimum sentences does not serve any of the purposes of the criminal law identified in *Oliver.* These sentences could not discourage or deter, for a wrongdoer who commits such an offense after the effective date of the Act can no longer receive a mandatory minimum term. Confinement to protect society is a valid penological goal, but the Council has rejected the notion that mandatory sentences for nonviolent drug offenders are necessary to achieve that purpose. Incarceration of a defendant for a period longer than the judge believes that the defendant deserves cannot reasonably be viewed as rehabilitative. Assuming, *arguendo,* that retribution is a legitimate consideration, it makes little sense to punish these defendants with inflexible severity, regardless of their individual circumstances, when the sentence for every offense committed after May 25, 1995 will depend on a judge's assessment of the facts of the particular defendant's case.

It is noteworthy that *Oliver* and all of the other cases which I have discussed above involved savings statutes (or provisions similar to savings statutes), and that in each case, notwithstanding the existence of such a statute, the court applied an ameliorative sentencing provision to an offense committed prior to the effective date of the new enactment. The precise content of the particular statute varied from jurisdiction to jurisdiction, but the decisions of the highest state courts did not turn on these variations. Indeed, the Supreme Court of Michigan held that, in that jurisdiction, defendants were entitled to be sentenced under an ameliorative statute which was enacted subsequent to the dates of their offenses, but which became effective prior to sentencing, notwithstanding the existence of a Michigan general savings statute substantially identical, word for word, to the federal provision on which the government relies in the appeals now before the court. *Schultz, supra,* 460 N.W.2d at 509–12.

My colleagues, however, reject these cases as erroneously decided. They insist instead that the federal and local general savings statutes control the proper disposition of these appeals, and that they trump all other considerations. I disagree.

### C. The Savings Statutes.

#### (1) Historical origins.

"At common law, the repeal of a criminal statute abated all prosecutions which had not reached final disposition in the highest court authorized to review them." *Bradley v. United States,* 410 U.S. 605, 607, 93 S.Ct.

---

the MMSAA was not intended to impose retribution upon those defendants who, in the sentencing judge's view, did not deserve the previously mandatory punishment. On the contrary, the statute was enacted to return to sentencing judges discretion which had been withheld from them under the mandatory minimum sentencing laws.

11. The court in *Oliver* carefully distinguished cases in which final judgment had been imposed prior to the effective date of the ameliorative statute:

It may be well to note that the construction that we are here according to the amendment cannot be applied in favor of an offender tried and sentenced to imprisonment before its enactment. . . . This inevitably follows from the settled rule that, once final judgment has been pronounced, a change in the law does not arrest or interfere with execution of the sentence. . . . Whenever the Legislature alters existing law, a certain measure of inequality is bound to ensue. Where the change is ameliorative and reflects a judgment that the earlier law was unduly harsh or unjust, *a court should not withhold* the benefits of the new statute to one tried after its passage, merely because it is powerless to extend them to those already convicted.

151 N.Y.S.2d at 375–76, 134 N.E.2d at 203 (emphasis added).

The emphasized language, in my view, refutes the purported rationale propounded by the majority for imposing mandatory minimum sentences on these defendants. See maj. op. at 79. Surely my colleagues do not seriously ascribe to the Council the view that a defendant should receive a lengthy prison sentence which he does not deserve simply because another defendant has already received such a sentence. The fact that our elected representatives were unable to correct what they viewed as an injustice to persons previously sentenced could hardly have motivated them to insist that a like injustice be inflicted on additional defendants. I therefore believe that Judge Fuld had it exactly right.

1151, 1154, 35 L.Ed.2d 528 (1973) (citations omitted). As Chief Justice Marshall explained many years ago in *Yeaton v. United States*, 9 U.S. (5 Cranch) 281, 3 L.Ed. 101 (1809),

> it has long been settled, on general principles, that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute.

*Id.* at 283; *accord, United States v. Chambers*, 291 U.S. 217, 223, 54 S.Ct. 434, 435, 78 L.Ed. 763 (1934). This rule of abatement applied even where a statute was repealed and re-enacted with different penalties. *Bradley, supra,* 410 U.S. at 607–08, 93 S.Ct. at 1154.

Under the common law rule, courts were often faced with an anomalous result. Where a statute was amended to impose a different punishment, a defendant could not be prosecuted under the earlier version, because it had been repealed, or under the later one, because such a prosecution would have been barred by the Constitution's *Ex Post Facto* Clause. *See Schultz, supra,* 460 N.W.2d at 510. A defendant could thus escape punishment even though his conduct was proscribed both by the original statute and by its amended version. *Id.*

There were various means available to avoid the incongruous and unjust consequences which sometimes resulted from the common law rule. The legislature could, for example, include in each repealing enactment a specific clause stating that prosecutions of offenses under the repealed statute were not to be abated. *See Bradley, supra,* 410 U.S. at 608, 93 S.Ct. at 1154 (citation omitted). In order to obviate the need to insert such a clause in every repealing statute, however, Congress and many state legislatures enacted general savings statutes such as those on which the government relies in this case. *See* Note, *Today's Law and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation,* 121 U.Pa.L.Rev. 120, 121–30 (1972). The MMSAA contains no individual provision concerning abatement, and the present appeals turn on the effect of the federal and District of Columbia general savings statutes.

The federal provision, now codified in 1 U.S.C. § 109, was enacted in 1871 in order to preclude the technical abatement of a prosecution for an offense that was committed before the criminal statute was repealed. *Hamm v. City of Rock Hill,* 379 U.S. 306, 314, 85 S.Ct. 384, 390, 13 L.Ed.2d 300 (1964); *see also Warden v. Marrero,* 417 U.S. 653, 660–61 & n. 11, 94 S.Ct. 2532, 2536–37 & n. 11, 41 L.Ed.2d 383 (1974). It provides that the

> [r]epeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. The District of Columbia general savings statute on which the government relies was enacted in 1990, and its provisions are substantially identical, for present purposes, to those of its federal counterpart:

> The repeal of any act of the Council shall not release or extinguish any penalty, forfeiture, or liability incurred pursuant to the act, and the act shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of any penalty, forfeiture, or liability, unless the repealing act expressly provides for the release or extinguishment of any penalty, forfeiture, or liability.

D.C.Code § 49–304(a) (1995).

*(2) Principles of construction.*

The general savings statutes on which the government relies are in derogation of the common law. "It is an established rule of statutory construction that statutes changing the common law are to be strictly construed." *Jones v. Jones,* 63 App.D.C. 373, 374, 72 F.2d 829, 830 (1934). Indeed, "no statute is to be construed as altering the rules of the common law, farther than its words plainly import." *McCarthy v. McCarthy,* 20 App.D.C.

195, 202 (1902) (*error dismissed*, 189 U.S. 515, 23 S.Ct. 850, 47 L.Ed. 925 (1903)) (citing *Shaw v. Railroad Co.*, 101 U.S. 557, 565, 25 L.Ed. 892 (1879)); *see also Monroe v. Foreman*, 540 A.2d 736, 739 (D.C.1988) (quoting *Shaw*). "It being an exception to the common law, and this being a criminal case, [the federal savings] statute must be strictly construed." *United States v. Auerbach*, 68 F.Supp. 776, 778 (S.D.Cal.1946). Accordingly, the mandatory minimum sentences in these cases can be sustained only if that result is plainly compelled by the statutory language.

Moreover, if there is any significant ambiguity in the general savings statutes with respect to their effect upon mandatory minimum penalties, then the rule of lenity applies. *Bifulco, supra*, 447 U.S. at 387, 100 S.Ct. at 2252; *see also* authorities cited at note 8, *supra*. Especially in a case like this, in which these defendants and many others face lengthy and potentially unmerited incarceration, we may not construe the savings statutes as compelling the imposition of mandatory minimum sentences unless the Council has *clearly* stated that this result was intended. *Bass, supra*, 404 U.S. at 348, 92 S.Ct. at 522–23; *see also Koon v. United States*, —— U.S. ——, ——, 116 S.Ct. 2035, 2044, 135 L.Ed.2d 392 (1996) (recognizing "the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances").

With due respect to my colleagues in the majority, I find altogether implausible the notion that the general savings statutes "plainly" mean that mandatory minimum sentences must be imposed on defendants sentenced after the effective date of the MMSAA. Indeed, the language of these statutes has to be stretched well beyond its ordinary meaning to accommodate my colleagues' reading of them. In addition, the notion that savings statutes trump all other indicia of legislative intent appears to me to be at odds with common sense. If the legis-

lators in fact intended that non-violent drug dealers should not be subject to mandatory minimum sentences, that intent ought not to be "flicked aside," *cf.* maj. op. at 47, solely because they failed to dot their i's or cross their t's.

### (3) "Release or extinguish."

The government's reliance in these appeals on the federal and local general savings statutes rests entirely on its theory that the MMSAA "released" or "extinguished" the penalties which applied under prior law. If there has been no release or extinguishment, then neither of these statutes has any application,[12] and the sentencing judge must apply the law in effect at the time of sentencing. *See United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801); *Oliver, supra*, 151 N.Y.S.2d at 372–73, 134 N.E.2d at 201. The majority does not contest this proposition.

Two of the defendants in these cases— Steven Holiday and Frederick R. Burgess— were convicted of distribution of crack cocaine. A third defendant, James H. Palmer was convicted of distribution of dilaudid. It is undisputed that prior to the effective date of the MMSAA, the mandatory minimum sentence for the offenses committed by each of these men was four years. *See* D.C.Code § 33–541(c)(1)(A–1)(A–2).

Jae Hoa Park was convicted of possession of powdered cocaine with intent to distribute it (PWID). As a result of the statutory quirk discussed in Part II of this opinion, Ms. Park was subject to, and received, a mandatory minimum sentence of five years. *See* D.C.Code § 33–541(c)(1)(A–2)(ii) (1993).

Contrary to the assumption on which the government's argument rests, the MMSAA was not designed to "release" or "extinguish" the penalties to which these defendants were subject. After the effective date of the Act, the maximum penalty for all four defendants was imprisonment for thirty years. *See*

---

12. The decisive importance of the words "release and extinguish" is most apparent in the phrasing of D.C.Code § 49–304(a), which provides that the repealed statute remains in effect for the enforcement of any penalty *"unless the repealing act expressly provides for the release or extinguish-* *ment of any penalty...."* If the repealing statute has effected no release or extinguishment, then no express provision releasing or extinguishing any penalty is required, and the savings statute has no application.

D.C.Code § 33–541(a)(2)(A) (1993). This means that, under the District's felony sentencing practice, each defendant could be sentenced to serve a minimum of ten and a maximum of thirty years. *See* D.C.Code § 24–203(a) (1996) (minimum period of incarceration in indeterminate felony sentence shall not exceed one-third of maximum sentence). In the cases of Holiday, Burgess and Palmer, each sentencing judge was thus authorized under the MMSAA to impose minimum terms of incarceration two and one half times as long as the previous mandatory sentence. The judge in Ms. Park's case was authorized under the MMSAA to send her to prison for a minimum term twice as long as the mandatory minimum established by prior law.

In my view, the sentencing court's retention of the authority to impose sentences

far more severe than the previous mandatory minimum terms conclusively refutes the notion that the prior penalties have been "extinguished" or "released."[13] A penalty cannot reasonably be said to have been extinguished if the sentencing judge can continue to impose it, and if he or she may even order a defendant's incarceration for twice as long or longer than the former mandatory minimum period.[14] A sentence of from four to twelve years is no longer called a "mandatory minimum" sentence, but a judge can still make a defendant serve it. The word "release" is concededly more ambiguous than "extinguish," but the savings statutes assuredly do not *plainly* require the preservation of mandatory minimum sentencing authority. *Cf. Bass, supra,* 404 U.S. at 348, 92 S.Ct. at 522–23; *McCarthy, supra,* 20 App.D.C. at 202.[15]

**13.** My colleagues characterize as "self-refuting," maj. op. at 74 n. 32, the proposition that where the legislature provides alternative sentencing options to what was previously a mandatory sentence, but where the court may still impose the same period of incarceration as before, there has been no extinguishment or release of the penalty. I suggest that the impartial reader who knows the meaning of the word "extinguish" will have considerable trouble following the majority's drift, particularly since the statute must be narrowly construed—a principle of construction the applicability of which my colleagues cannot and do not contest. Moreover, contrary to my colleagues' patent *non-sequitur,* the "fact that defendants and prosecutors alike perceived a considerable difference between mandatory and discretionary penalties," *id.*—a difference no rational person can deny—does not prove that the MMSAA *extinguished* or *released* any penalties. On the contrary, the statute merely provided new alternative options to the sentencing judge, in addition to the non-released and non-extinct sentences of four to twelve years (or more) that the judge could still impose.

The majority's reliance on *Ex Post Facto* Clause jurisprudence, *e.g., Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937) is founded on the same *non-sequitur.* A sentence of four years without parole is obviously harsher than a sentence of four years from which the defendant can be paroled. Under the MMSAA, however, a defendant can be sentenced to serve more than four years before being paroled, and there has thus been no extinguishment or release.

**14.** The government contended at oral argument that the MMSAA did "extinguish" mandatory minimum sentences because defendants sentenced after its effective date would be entitled to

credit for good time, while those serving mandatory minimum terms would not. *See* D.C.Code § 24–434 (1996). Because the judge in each of these cases could sentence the defendant to a term of imprisonment of from ten to thirty years, however, he or she could easily adjust for good time credits by simply raising the minimum sentence accordingly. The judge's power to impose the equivalent of the previous mandatory minimum sentence was not realistically affected at all, and, *a fortiori,* was not released or extinguished, by the enactment of the MMSAA.

**15.** Properly understood, *Marrero, supra,* 417 U.S. at 659–63, 94 S.Ct. at 2536–38, is not to the contrary. In that case, the defendant *had already been sentenced* to a mandatory minimum term when the statute authorizing parole was enacted. Justice Brennan's entire analysis arose in the context of a mandatory minimum sentence which Marrero was serving, and from which he sought to be released on the basis of a retroactive application of a new law authorizing parole. The majority's theory that this critical difference from the facts in the present appeals was irrelevant to the Court's analysis is entirely speculative. *See also* note 16, *infra.*

Moreover, the opinion in *Marrero* does not directly address the precise contention, central to this dissent, that a penalty is not released or extinguished if the judge can still impose it. This is likewise true of *United States v. Jacobs,* 919 F.2d 10, 12 (3d Cir.1990) and *United States v. Cook,* 890 F.2d 672, 675–76 (4th Cir.1989). "Questions that merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925); *Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994) (quoting *Webster*).

The present case may profitably be compared with *Hurwitz v. United States*, 60 App.D.C. 298, 53 F.2d 552 (1931), which the government characterizes as binding authority. In *Hurwitz*, a case involving the prohibition laws, the Jones Act, which was in force at the time of the commission of the offense, authorized a penalty of imprisonment for five years and a fine of $10,000. An amendment to the Jones Act which became effective a few days before Hurwitz was sentenced reduced the maximum penalty to imprisonment for six months and a fine of $500. The court held that in accordance with the federal savings statute, Hurwitz was properly sentenced under the earlier and more severe provisions. In *Hurwitz*, however, the amending legislation plainly extinguished the penalties authorized by the Jones Act at the time Hurwitz committed the crime, for a prison sentence of more than six months, or a fine of more than $500, could no longer be imposed under the statute as amended. This represents a dramatic contrast to the present case, in which the judge retains the authority to impose not only the same period of imprisonment available under the mandatory minimum sentencing scheme, but also a far longer term.

As a practical matter, the MMSAA effectively preserved, and did not release or extinguish, penalties previously in effect. Indeed, in urging its enactment, the proponents of the statute pointed out to the Councilmembers that the MMSAA would not prevent the imposition of long sentences in appropriate cases. See page 94, *supra*. The essence of the MMSAA was to provide judges with additional discretionary sentencing options, which would allow the punishment to fit the crime and the offender, and would thus avoid injustice in individual cases. To me, it is simply incongruous to suggest that these savings statutes, which were designed primarily to prevent technical abatements and the absurd consequences that could sometimes flow from the common law rule, should now be construed as "saving" judges from their right to exercise sentencing options which the legislature has effectively found to be essential in order to avoid injustice.[16]

**16.** The government relies on *Johnson v. United States*, 576 A.2d 739 (D.C.1990) (per curiam). In that case, the defendant was sentenced to a mandatory minimum term of imprisonment in 1985. In 1987, the Council enacted legislation authorizing the judge to waive mandatory minimum sentences under the so-called "addict exception." Johnson sought retroactive modification of his sentence pursuant to the addict exception. This court affirmed the denial of his request, noting that the amendment was enacted after Johnson's conviction had become final. *Id.* at 740. The court added by way of dictum that "the 1987 Amendment, if applied to appellant's 1985 conviction, would 'release or extinguish' the penalty he incurred, *viz*, mandatory imprisonment." *Id.*

*Johnson* is readily distinguishable. In *Johnson*, the defendant had been sentenced before the effective date of the ameliorative statute. In the cases now before us, the sentences were imposed after the MMSAA came into effect. *Compare Duvall v. United States*, 676 A.2d 448, 451–52 (D.C.1996) *with Alpizar v. United States*, 595 A.2d 991 (D.C.1991). The court's brief comments in *Johnson* regarding the language of 1 U.S.C. § 109 were not necessary for the disposition of the case, and no attempt was made to analyze the terms "release" or "extinguish." The dictum in *Johnson* is not binding on us, *see, e.g., Albertie v. Louis & Alexander Corp.*, 646 A.2d 1001, 1005 (D.C.1994), and I find it to be too cryptic to be persuasive.

The government's reliance on *Marrero, supra*, is also misplaced. See note 15, *supra*. In *Marre-*

*ro*, as in *Johnson*, the defendant had been sentenced prior to the enactment of the ameliorative statute. 417 U.S. at 655, 94 S.Ct. at 2534. In contending that he was belatedly entitled to be considered for parole on a mandatory minimum sentence, the defendant was effectively asking the Court to treat the new statute as a legislative pardon. Nothing like that is presented here.

*Marrero* appears on its own facts, to have been an overwhelming case for the government. The court in *Oliver* would plainly have decided it as did the Supreme Court. See note 11, *supra* (quoting *Oliver*, 151 N.Y.S.2d at 375–76, 134 N.E.2d at 203); *People v. Walker*, 81 N.Y.2d 661, 603 N.Y.S.2d 280, 283–84, 623 N.E.2d 1, 4–5 (1993) (where defendant sought reduction of 1984 sentence on basis of 1986 amendment, *Oliver's* amelioration doctrine does not apply). Even so, three justices dissented in *Marrero*.

The present case is a much closer one. The *Oliver* approach plainly favors these defendants; indeed, the majority finds it necessary to reject *Oliver* and similar decisions in order to rule for the government. I do not believe that the *Marrero* Court would have been ready to reject that impressive line of well-reasoned cases. The Court's statement in *Marrero* that "the saving clause has been held to bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense," *id.* at 661, 94 S.Ct. at 2537, must be understood in the context of the facts before the Court, and not the entirely different situation presented by these appeals. *See Armour & Co. v.*

*(4) Legislative intent as controlling.*

Even if the MMSAA could reasonably be construed as "releasing" or "extinguishing" penalties applicable under prior law—and I do not believe that it can—I still could not agree with the majority's disposition. My colleagues accord more or less conclusive weight to the general savings statutes, even where, as here, all other indicia of legislative intent point in the opposite direction. The courts have generally declined to attach controlling significance to the literal terms of savings statutes and similar enactments where to do so would defeat the discernable will of the legislature.[17]

I begin with a dose of reality. As Justice Schaefer explained for the Supreme Court of Illinois in *People v. Bilderback*, 9 Ill.2d 175, 137 N.E.2d 389 (1956), a general savings statute

> is at best the statement of a present legislature as to the intention of a future one. It is so easy to show that the statute, when applicable, has often been overlooked by lawyers and judges that it is hard to believe that legislators have always had it in mind. Without looking beyond our own borders, it is clear that here, at least, such a statute has not been an effective substitute for individualized statements of legislative purpose.

*Id.*, 137 N.E.2d at 393. If only for the very reason "that it is hard to believe that legislators have always had [the general savings statute] in mind,"[18] *id.*, the existence of such

---

Wantock, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944) (the "words of our opinions are to be read in light of the facts of the order under discussion.... General expressions transposed to other facts are often misleading.")

17. I do not believe that there is any binding precedent in this jurisdiction, either way, on the issue under discussion. *Jones v. United States*, 117 U.S.App.D.C. 169, 327 F.2d 867 (1963), has no bearing on this case. There Congress repealed the mandatory death penalty two years after the defendant was sentenced to death, and the court held that the amendment did not apply to the defendant.

The government relies on *Hurwitz, supra*, but that case differs from ours in that, as we have seen, the amendment did "extinguish" prior maximum penalties. Moreover, the opinion is cryptic and conclusory. The court did not state whether there was any evidence that the statute was intended to apply to pending cases, nor did it address the question whether the savings statute would trump such evidence if it existed. Finally, my examination of the briefs in *Hurwitz*, written two-thirds of a century ago, reveals that the defendant did not present to the court the kind of issue decided in *Oliver, Estrada, Schultz* and similar cases. "The judicial mind [was not] applied to and [did not] pass upon the precise question" with which we are now presented, *Murphy, supra*, 650 A.2d at 205, a fact which further dilutes the precedential force of *Hurwitz*.

The defendants rely on *Melson v. United States*, 505 A.2d 455 (D.C.1986) (per curiam). In that case, this court held that the defendant, who had committed his offense prior to the repeal of the Federal Youth Corrections Act (FYCA), could not lawfully be sentenced pursuant to the FYCA after the effective date of the repeal. *See* maj. op. at 71 n. 26. The repealing legislation contained no language saving pending prosecutions. The general savings statute was brought to the attention of the court, but it was not cited in the court's opinion. Although *Melson* could plausibly be read as implicitly holding that the general savings statute will not permit the sentencing of a defendant under a repealed sentencing scheme, I am reluctant to consider the decision as authority for a proposition which the court never explicitly addressed. *See, e.g., District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C.1996).

There is likewise no binding federal precedent. I have previously explained that in *Marrero*, the only Supreme Court decision raising issues even arguably comparable to those here, the defendant's sentencing *preceded* the repeal. *See* note 16, *supra*. In *United States v. Ross*, 464 F.2d 376 (2d Cir.1972), *cert. denied*, 410 U.S. 990, 93 S.Ct. 1507, 36 L.Ed.2d 188 (1973), on which the government relies heavily, the repealing legislation provided that "prosecution for any violation of the law occurring prior to [the effective date of the new statute] shall not be affected by the repeal [of the old statute] or abated by reason thereof." *Id.* at 379. The discussion in *Ross* of the general savings statute was therefore pure dictum. Even if *Ross* were in point, which it is not, this court would not be required to follow it, for "only a decision of the Supreme Court of the United States is binding on us." *Hornstein v. Barry*, 560 A.2d 530, 536 n. 15 (D.C.1989) (en banc).

18. In *Melson, supra* note 17, this court held that a defendant could not lawfully be sentenced pursuant to the FYCA, after the repeal of that statute, for conduct committed prior to the repeal. It did so without mentioning the general savings statute, thus corroborating Justice Schaefer's thesis. If we are to indulge the fiction that our Councilmembers—lawyers and lay people alike— always have the savings statutes in mind, and that they also keep up with our cases and our interpretations of various statutes, then it follows that our legislators could readily infer from *Melson* that mandatory minimum penalties would

a statute cannot provide conclusive guidance as to true legislative intent. If "the Federal Rules [of Civil Procedure] reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive as to the outcome," *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), then surely, a *fortiori,* we cannot accept the notion that the Council's perhaps accidental failure to include in the MMSAA an "express provision" of the kind contemplated by the general savings statutes *automatically* dooms these defendants and others to lengthy, unnecessary, unintended, and in some cases undeserved terms of incarceration.

In general, the courts—including the Supreme Court, *see Hertz v. Woodman,* 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001 (1910)—have treated general savings statutes not as announcing an inflexible rule of law, but rather as providing *"a rule of construction ...,"* which is to be "read and construed as a part of all subsequent repealing statutes, *in order to effect the will and intent of Congress." Id.* at 217, 30 S.Ct. at 623 (emphasis added; citations omitted). In *Great Northern Ry. Co. v. United States,* 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567 (1908), on which my colleagues claim to rely, maj. op. at 79–80 n. 44, the Supreme Court expressly stated that the provisions of what is now 1 U.S.C. § 109 "cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment." *Id.* at 465, 28 S.Ct. at 316.

A general savings statute, like a legislative presumption against retroactivity,

> is not an end in itself. Like any rule of construction, [it] is subservient to the goal of statutory interpretation: to ascertain and effectuate legislative intent.

*Cummings, supra,* 386 N.W.2d at 471 (citations omitted). The Supreme Court of California made the point effectively in *Estrada, supra:*

> That rule of construction, however, is not a strait-jacket. Where the legislature has

not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent.

48 Cal.Rptr. at 176, 408 P.2d at 952 (emphasis added).[19]

In *Behlog, supra,* Judge Hancock, writing for the unanimous New York Court of Appeals, noted that savings clauses were enacted principally to avoid the incongruous results of a common law rule which allowed offenders to go unpunished when a criminal statute was repealed or when the punishment was increased. 544 N.Y.S.2d at 806–07, 543 N.E.2d at 71. He explained that where the legislature has enacted an ameliorative statute,

> [t]he anomaly which prompted the enactment of the savings clauses does not exist. Absent some valid reason to require the stricter penalty, the 'savings clauses' should not be used to mete out the harsher sentence.

*Id.,* 544 N.Y.S.2d at 807, 543 N.E.2d at 71–72 (citations omitted).

In my opinion, it is our obligation in this case to avoid the potential analytical "strait-jacket," *Estrada, supra,* 48 Cal.Rptr. at 176, 408 P.2d at 952, into which the government's argument seeks to force us. In attempting to ascertain the Council's intent in enacting the MMSAA, we must certainly include in our calculus the provisions of the two general savings statutes, as well as the failure of the Council to include any express provision applying the new sentencing scheme to cases pending at the time the Act became effective. We would do well, however, to be just a bit "earthy" about the problem, and to bear in mind Justice Schaefer's wise observations in *Yensavage* regarding legislative realities.

not apply in the circumstances now before us, and that the insertion into the MMSAA of a statement expressly so providing would not be necessary.

**19.** The court was referring to California's statutory presumption against retroactivity of legislative enactments.

In the final analysis, I am satisfied, for the reasons stated earlier in this opinion, that the legislative record in this case demonstrates the Council's intent that mandatory minimum sentences not be imposed on these defendants. I believe that the state court cases, beginning with *Oliver* and ending with *Schultz* and *Behlog,* have by far the best of the argument, and that in the absence of binding contrary precedent, we should follow their teaching.

I add one further thought. Our decisions have consequences. There is more at stake in this case than in most. If the government ultimately prevails, then the result for the defendants, for their families, and for others similarly situated will be truly tragic. Holiday and the other defendants will be incarcerated for a very long time. This will happen even though each of the three sentencing judges has indicated that he or she would not impose the mandatory minimum term if a less severe sentence were legally authorized. Ill defendants may die in prison, more children of minor drug dealers will suffer unnecessarily, and racial and ethnic minorities will continue to bear disproportionately the brunt of a policy which the Council has rejected.

If the Council intended these results, then judicial inquiry is at an end. Courts may not substitute their own views for those of the legislature. But in assessing the Council's intent, it is significant that, so far as I can discern, this protracted mandatory incarceration will serve no useful penological purpose. There will be no deterrence, no relevant incapacitation, no rehabilitation, and only the most selective retribution. Severe punishment will be imposed primarily because, a century and a quarter ago, Congress passed a general savings statute [20] which, in the majority's opinion, tells us in advance what the 1994 Council intended.

No judge knows everything. I certainly do not. Perhaps the Council intended the result which the majority now ordains. Because of what is at stake, however, I venture

to ask of those who reject my interpretation whether they are sure. I suggest that if there is any real doubt—if the statutes can fairly be read either way—then this case must be decided in favor of allowing the judge to sentence each defendant on the merits of that defendant's own circumstances.

## II.

### MS. PARK'S EXTRA YEAR.

The majority also upholds against constitutional challenge the five-year mandatory minimum sentence which Jae Hoa Park received for possession of 13 grams of powdered cocaine with intent to distribute it (PWID). If the contraband in question had been crack cocaine (cocaine base), a far more addictive and dangerous substance, then Ms. Park's minimum sentence would have been only four years. In my opinion, the imposition of the fifth year of Ms. Park's mandatory minimum sentence deprives her of liberty without due process of law. I can find no rational basis whatever for requiring her to serve a mandatory additional year in prison.

An examination of the Omnibus Narcotic and Abusive Drug Interdiction Amendment Act of 1990 (ONADIAA),[21] and of its legislative history,[22] persuades me that, in all probability, the five-year mandatory minimum for minor dealers in powdered cocaine was included in the statute unintentionally, perhaps as a result of administrative error. If the extra year was intended, it is unconstitutional.

#### A. *Powdered Cocaine and Crack Cocaine.*

The government cannot and does not dispute the proposition that crack cocaine is a great deal more dangerous than the powdered form of the drug. "Crack is far more addictive than cocaine. It is far more accessible due to its relatively low cost. And it has experienced an explosion of popularity."

---

20. The Council, of course, enacted a similar statute in 1990.

21. *See* D.C.Law 8–138, 37 DCR 2638, now codified at D.C.Code § 33–541(c)(1)(A–2)(ii) (1993).

22. Council of the District of Columbia, Committee on the Judiciary, Report on Bill 8–495, the [ONADIAA] (March 7, 1990) (ONADIAA Report).

*United States v. Cyrus,* 281 U.S.App.D.C. 440, 443, 890 F.2d 1245, 1248 (1989).

The United States Sentencing Guidelines treat distribution of one gram of crack as being equivalent, for purposes of sentencing, to the distribution of 100 grams of powdered cocaine. *See, e.g., United States v. Lawrence,* 951 F.2d 751, 754 (7th Cir.1991). The validity of such dramatically disparate treatment has been consistently sustained by the courts, for

> Members of Congress considered cocaine base to be more dangerous to society than cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence. Senator D'Amato addressed specifically the reasoning underlying the '100 to 1 ratio':
>
> > 'Because crack is so potent, drug dealers need to carry much smaller quantities of crack than of cocaine power. By treating 1,000 grams of freebase cocaine no more seriously than 1,000 grams of cocaine powder, which is far less powerful than freebase, current law provides a loophole that actually encourages drug dealers to sell the more deadly and addictive substance, and lets them sell thousands of doses without facing the maximum penalty possible.'
>
> 132 Cong.Rec. S8092 (daily ed. June 20, 1986).

*United States v. Buckner,* 894 F.2d 975, 978–79 (8th Cir.1990) (footnote omitted); *see also id.* n. 9; *accord, Lawrence, supra,* 951 F.2d at 754.

In enacting the ONADIAA, the Council of the District of Columbia likewise recognized that crack is more dangerous than powdered cocaine. Under that legislation, a defendant who distributes 50 or more grams of crack is a "major dealer." By contrast, a trafficker who sells less than *500* grams of powdered cocaine is treated as a "minor dealer." *See* D.C.Code § 33–541(c)(1)(A–2)(ii). There is only one explanation for this ten-to-one ratio; the Council knew that a small amount of crack can do a great deal more harm than a like amount of cocaine powder.

### B. The ONADIAA and "Tiered" Sentencing.

The ONADIAA was enacted in substantial part in order to provide penalties for major drug traffickers which are more severe than those imposed upon minor dealers. In addressing the "background and need" for the proposed legislation, the Judiciary Committee stated:

> One problem with the original mandatory minimum initiative (D.C.Law 4–166) was that it treated all drug traffickers the same, regardless of the amount of drugs involved.

ONADIAA REPORT at 2. The bill therefore "establishe[d] a new tiered structure by distinguishing between a major and a minor dealer for drug distribution convictions." *Id.* at 3.

### C. The Incongruity of Ms. Park's Extra Year.

In order to explain the logical and constitutional problems presented by Ms. Park's sentence, I now reproduce the table which Judge Ferren has helpfully included in the opinion of the court. See maj. op. at 88.

| | CRACK COCAINE | COCAINE POWDER | OTHER NARCOTICS |
|---|---|---|---|
| | Major Dealer (50+ grams) | Major Dealer (500+ grams) | Major Dealer (500+ grams) |
| 1st offense | 5 years | 5 years | 5 years |
| 2nd or subsequent offense | 10 years | 10 years | 10 years |

| | CRACK COCAINE | COCAINE POWDER | OTHER NARCOTICS |
|---|---|---|---|
| | Minor Dealer | Minor Dealer | Minor Dealer |
| | (Less than 50 grams) | (Less than 500 grams) | (Less than 500 grams) |
| 1st offense | 4 years | 5 years | 4 years |
| 2nd offense | 7 years | 8 years | 7 years |
| 3rd or subsequent offense | 10 years | 10 years | 10 years |

The careful reader will discern that the penalties reflected in this table are, for the most part, logical and consistent with one another. Major dealers are punished more severely than minor dealers, and a recidivist will receive more time for repeating his nefarious misdeeds. The one glaring exception is the penalty for distribution of cocaine powder. For a first offense, a major dealer in *cocaine powder* receives a mandatory minimum sentence of five years. Remarkably, however, a first-time minor dealer *receives exactly the same minimum sentence.*

Compare this treatment with the provisions for major and minor dealers in other drugs. A major dealer in crack cocaine, or in other narcotics, receives a five year mandatory minimum. His or her "minor dealer" counterpart, however, receives only four years.

With respect to crack cocaine and other narcotics, Judge Ferren's table confirms the sentencing scheme as described by the Judiciary Committee. Major dealers receive an extra year in prison. With respect to powdered cocaine, on the other hand, the distinction between major and minor dealers—the *raison d' tre* of the ONADIAA—has been abandoned or ignored. Everyone who distributes powdered cocaine receives the same mandatory minimum, regardless of the amount distributed. With respect to this single drug, the conditions that caused the Council to enact the ONADIAA continue unabated—identical sentences remain for major and minor dealers, contrary to the stated legislative design.

The second incongruity of the sentencing scheme for cocaine powder is that the minor dealer in that particular drug receives a more severe mandatory minimum sentence than his counterpart who sells far more addictive and far more dangerous crack cocaine. The Judiciary Committee Report contains no explanation for this unexpected result, which translates into an odd proposition: "the more dangerous the contraband, the lighter the penalty." I know of no rational explanation for such a rule.

Human beings are finite creatures. They make mistakes. I believe that this is what happened here.[23] I consider it highly improbable that the Councilmembers intentionally ignored the difference between major and minor dealers in powdered cocaine. I likewise do not believe that they really meant to impose a more severe mandatory minimum sentence on the seller of a less dangerous drug than on the distribution of a more dangerous one. Rather, I suspect that the wrong number may have been written into the statute as a result of somebody's error.[24]

23. Judge Ferren claims that the possibility of a mistake is "refuted by the references to the increased penalty in the legislative history." He ignores the probability that the figures were automatically carried over from one document to the second.

24. I note that a similar discrepancy exists in relation to second offenses by minor dealers. A minor dealer in crack or other narcotics receives a mandatory minimum of seven years. A minor dealer in powdered cocaine receives eight years. A major dealer in powdered cocaine, however, is subject to a ten-year minimum for a second offense.

If the Council did intend the anomalous results which the statutory numbers suggest, then in my view the Constitution has been transgressed.

### D. Ms. Park's Constitutional Challenge.

In this jurisdiction, as in others, legislative enactments are protected by a presumption of constitutionality. *Hornstein, supra,* 560 A.2d at 533. The question is whether Ms. Park has overcome that presumption by showing, beyond a reasonable doubt, *id.,* that her sentence violates the Fifth Amendment. Ms. Park's burden is a formidable one, but I am satisfied that she has met it.

Ms. Park contends in essence that the sentence imposed upon her has deprived her of liberty without due process of law, in violation of the Fifth Amendment.[25] "The guaranty of due process demands only that a law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a reasonable and substantial relation to the object sought to be obtained." *Lapides v. Clark,* 85 U.S.App.D.C. 101, 102, 176 F.2d 619, 620, *cert. denied,* 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949); *see also Gibson v. United States,* 602 A.2d 117, 119–20 (D.C. 1992) (applying rational basis test to allegation that defendant's sentence violated equal protection principles). The test, then, is one of rationality.

"[O]ur determination of the existence of a rational basis for the distinction contained in the statute is limited to whether any state of facts either known or which could reasonably be assumed affords support for it." *Gibson, supra,* 602 A.2d at 120 (citations and internal quotation marks omitted). The legislature is not required to articulate its reasons for enacting the challenged provision; if the reasons for the legislative action are plausible, judicial inquiry is at an end. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461–62, 66 L.Ed.2d 368 (1980); *Backman v. United States,* 516 A.2d

923, 928 (D.C.1986) (per curiam) (Ferren, J., concurring in the result). Conversely, if the reasons for the Council's actions are *not* plausible—if the legislation lacks a rational basis—then it does not pass constitutional muster.

### E. The Government's Justification.

The ONADIAA contains no explanation of the extra year for powdered cocaine. In its brief, however, the government hypothesizes that

> the Council rationally could have believed that small dealers in cocaine powder are less likely than small dealers in cocaine base to be addicts who sell simply to support their habits. Thus, the Council could conclude, low-level dealers in cocaine base generally do not deserve the more severe punishment due low-level dealers in cocaine powder.

Converting understatement into an art form, my colleagues in the majority say that the government's argument seems "strained." Maj. op. at 89. I would have used a more emphatic adjective.

The government's position is based on the notion that the Council decided, in the ONADIAA, to treat the distribution of small quantities of a *less* addictive substance more severely than the distribution of *more* dangerous ones. Such a legislative design would represent a dramatic departure from this jurisdiction's controlled substances laws, which have always been predicated on the theory that the more dangerous the drug, the more severe the penalty. In the District, the distribution of marijuana—probably the least addictive and harmful of the drugs which have been in vogue in recent years—is a misdemeanor, punishable by a maximum of a year in prison. *See* D.C.Code §§ 33–541(a)(2)(D), –522. Trafficking in addictive "hard" drugs, on the other hand, *e.g.* heroin, PCP, and crack cocaine, is a felony punishable by incarceration for thirty years, *id.* § 33–541(a)(2)(A), and was subject to a man-

---

**25.** Unlike the Fourteenth Amendment, the Fifth Amendment contains no Equal Protection Clause. The Supreme Court has held, however, that the Due Process Clause of the Fifth Amendment embraces equal protection principles. *Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954). Ms. Park has formulated her constitutional assault on her sentence in equal protection terms. Whether we view the case doctrinally as falling within the equal protection rubric or as raising an issue of substantive due process, the dispositive question is the same: was there a rational basis for the challenged legislative action?

datory minimum until the enactment of the MMSAA.

Moreover, as I have noted, both Congress and the Council were aware that crack is more addictive and more dangerous than powdered cocaine. If the Council had really intended to punish the sale of powdered cocaine more severely, then some mention of such a radical change of direction would surely have found its way into the Judiciary Committee Report. *See NOW v. Mutual of Omaha Ins. Co.*, 531 A.2d 274, 276 (D.C. 1987). It did not.[26]

The government theorizes that the Council may have believed that sellers of crack cocaine are more likely than distributors of powdered cocaine, and that they should therefore be punished less severely. The "addict exception," however, was already a part of the law of the District of Columbia before the ONADIAA was enacted. *See* D.C.Code § 33–541(c)(2). Sellers of crack cocaine who qualified for the addict exception were not subject to mandatory minimum sentencing at all. Accordingly, it would make no sense to enact a lower mandatory minimum for a distributor of crack than for a seller of powdered cocaine on the theory that the former is more likely to be an addict. The qualifying addict who sold crack would not be affected by the mandatory minimum, however high or low it may be set.

In my opinion, there is nothing even approaching rationality in the government's im-

aginative hypothesized "rational basis" for the incongruous treatment of crack and powdered cocaine. If, as I suspect, the Council made an administrative error, then such an error surely cannot provide the rational basis which the Constitution requires before a defendant can be arbitrarily compelled to serve an additional year in prison. If the Council did it on purpose—and I simply cannot believe that this is what occurred—then the "extra year" must fall anyway, for the only proffered explanation of it is contrary to reason.

We are dealing here with a year of Ms. Park's life. Before she can be lawfully incarcerated for so much additional time for dealing in a less dangerous drug, some plausible reason must exist for such treatment. Plausibility cannot be manufactured by resort to imaginative hypotheses. The government's argument fails.

## F. The Remedy.

Counsel for Ms. Park asks us, in the event of a determination of unconstitutionality, to strike down in its entirety the mandatory minimum sentence for small dealers in powdered cocaine. The government persuasively argues that such a remedy is unnecessarily drastic, and that the proper remedy, in the event we find a constitutional violation, is to reduce Ms. Park's mandatory minimum sentence to four years.[27] On this limited issue, I

**26.** According to my colleagues, "[i]t is not surprising, nor does it violate the Constitution, for legislative bodies to attempt diametrically opposed, but rationally based, solutions to a particular social problem." Maj. op. at 89. In theory, that is absolutely correct, but this truism has nothing to do with the present case. Nobody seriously believes that the Councilmembers would adopt a solution so "diametrically opposed" to the norm without a single legislator saying anything about the subject. If my colleagues in the majority believed with very much conviction that the Council deliberately made this "diametrically opposed" choice here, then I do not think they would characterize the government's justification as "strained."

**27.** In its brief, the government argues as follows:
However, if the Court accepts appellant's constitutional claim, the remedy would not be to ignore the mandatory-minimum provisions of § 541(c), as appellant suggests.... The " 'cardinal principle of statutory construction

is to save and not to destroy.' " *Tilton v. Richardson*, 403 U.S. 672, 684, [91 S.Ct. 2091, 2098, 29 L.Ed.2d 790] (1971) (plurality opinion) (quoting *NLRB v. Jones & Laughlin Steel*, 301 U.S. 1, 30 [57 S.Ct. 615, 621, 81 L.Ed. 893] (1937)); *accord McClough v. United States*, 520 A.2d 285, 289 (D.C.1987). Thus, " '[a] court should refrain from invalidating more of the statute than is necessary.' " *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 [107 S.Ct. 1476, 1479, 94 L.Ed.2d 661] (1987) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 [104 S.Ct. 3262, 3269, 82 L.Ed.2d 487] (1984) (plurality opinion)). When a particular piece of a statute is found unconstitutional, it is the court's duty to maintain those portions of the statute that are valid. *Brock, supra,* 480 U.S. a[t] 684 [107 S.Ct. at 1479]; *Regan, supra*, 468 U.S. at 652 [104 S.Ct. at 3269]. " 'Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is

agree with the government's argument, subject of course to my view, set forth in Part I of this opinion, that no mandatory minimum sentence at all can lawfully be imposed on Ms. Park.

## III.

## CONCLUSION

In *Lowman v. United States,* 632 A.2d 88 (D.C.1993), an undercover officer approached a young woman named Katrina Lowman in the street and asked where he could purchase cocaine. Ms. Lowman led him to a dealer who sold the officer drugs. Ms. Lowman was subsequently arrested. Although there was no evidence of any coordination between Ms. Lowman and the dealer, Ms. Lowman was charged with and convicted of aiding and abetting the distribution of cocaine. This court affirmed her conviction. A majority of the court rejected Ms. Lowman's contention that her conduct aided the officer's possession of the drugs, a misdemeanor, rather than abetting felony distribution by someone with whom she had no connection. In light of this holding, Ms. Lowman was subject to a mandatory minimum sentence for her comparatively minor role in this transaction.[28]

Ms. Lowman, a mother of two young children, had tested positive for the AIDS virus. Her case was cited by the PDS Director in testimony before the Council, although the witness was apparently unaware of Ms. Lowman's affliction. I think it fair to say that Ms. Lowman's case presented the kind of situation which led the Council to repeal mandatory minimum sentences.

The majority's position in this case presumes that if Ms. Lowman had committed

her offense on the day before the effective date of the MMSAA, and if she had not been eligible for the addict exception, then the Council clearly intended that she *must* serve a mandatory minimum of four years, her illness and the plight of her children notwithstanding. My colleagues do not provide a plausible reason why a Council plainly bent on leaving the appropriate sentence to the judge's discretion would insist on withholding that discretion after the effective date of the Act, even if the judge viewed the mandatory minimum sentence as excessive for the particular defendant before the court. The majority's only explanation—that if someone else who committed an offense on the same day that Ms. Lowman did received an unmerited sentence, then Ms. Lowman should receive one too—unreasonably and unjustly ascribes to our legislature the canard that two (or more) wrongs make a right. My colleagues do not really argue that their decision vindicates the Council's actual intent. Rather, they perceive "the law" to be a kind of sinister force which compels a defendant to receive an undeserved sentence, notwithstanding the legislature's ameliorative intent, because our Councilmembers neglected to use the magic words contemplated by the savings statutes.

Judge Ferren has skillfully assembled an array of federal cases in support of their position. Although none of these decisions is controlling, some of them tilt the government's way. The state court cases, on the other hand, have the best of the argument from a common sense perspective, and the defendants plainly prevail if we follow these

fully operative as a law.'" *Buckley v. Valeo,* 424 U.S. 1, 108 [96 S.Ct. 612, 677, 46 L.Ed.2d 659] (1976) (per curiam) (quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma,* 286 U.S. 210, 234 [52 S.Ct. 559, 565, 76 L.Ed. 1062] (1932)); *accord, Brock, supra,* 480 U.S. at 684 [107 S.Ct. at 1479]; *Gary v. United States,* 499 A.2d 815, 821 (D.C.1985), *cert. denied,* 475 U.S. 1086 [106 S.Ct. 1470, 89 L.Ed.2d 725] (1986).

Here, the ... Council imposed a mandatory-minimum sentence for first-time dealers in "narcotic" drugs—defined to include cocaine. Even if the higher mandatory sentence for cocaine-powder offenses is invalidated, there is

no basis to reject the entire mandatory-minimum scheme as it relates to cocaine. Thus, appellant's sentence would be cut from five years to four years, but she should not escape a mandatory-minimum sentence altogether. *Cf. United States v. Pearson,* 202 A.2d 392, 393 (D.C.1964) (suggesting that judges could avoid potential unreasonable result simply by imposing sentence for attempted petit larceny that is no higher than maximum penalty for completed offense of petit larceny).

28. As events developed, Ms. Lowman was able to escape the mandatory minimum by availing herself of the "addict exception." She received a reduced prison sentence.

non-binding but persuasive precedents. In the final analysis, however, it is what the Council intended that counts. On that issue, in my view, the majority's thesis founders. Did the very legislators who set out to protect defendants from undeserved mandatory minimum sentences simultaneously mean to compel judges to impose such sentences on people like Katrina Lowman after the effective date of the Act? Unless we ascribe to the Council incongruous designs that work at cross-purposes with each other, the answer must be no.

## IV.

### COUNTER–POSTSCRIPT

I invite the unusually patient reader who has stayed with us this far to determine for himself or herself whether various contentions which Judge Ferren has attributed to me in his "postscript" correspond to the positions which I have actually taken in this dissenting opinion. I note only that it is the majority, and not yours truly, that has "decide[d] not to apply a law after it became effective"; that a Supreme Court decision involving a defendant who was sentenced before an ameliorative statute was enacted cannot (at least under any legal principles with which I am familiar) control cases in which a defendant is sentenced after the effective date of such a statute; and that if the legislative intent behind ameliorative statutes is obvious to the highest courts of New York and California (among many others), it ought to be apparent to my colleagues as well.

I agree with the majority that "[c]riminal conduct often brings tragedy." In the run-of-the-mill case, this goes with the territory, and the legislature can be presumed to have intended sad consequences because they could not be avoided. In this case, however, my colleagues ascribe to the Council the intention to inflict tragedy, after the effective date of the Act, even where the sentencing judge is satisfied that the defendant does not deserve the punishment that generates the misfortune. The MMSAA, as construed by the majority, thus brings a great deal of *demonstrably unnecessary* tragedy to the affected families and to the community at large.

Statutes are not to be construed as ordaining gratuitous suffering if such a construction can reasonably be avoided.

> General terms should be so limited in their application as not to lead to *injustice, oppression, or an absurd consequence.* It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character.

*United States v. Kirby,* 74 U.S. (7 Wall) 482, 486–87, 19 L.Ed. 278 (1868) (emphasis added). Justice Chase's language for the Court in *Noonan v. Bradley,* 76 U.S. (9 Wall.) 394, 19 L.Ed. 757 (1869), a case involving the interpretation of a contract, is equally applicable to statutes:

> [W]hen an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which standeth with the right.

*Id.* at 407; *accord, Lowman, supra,* 632 A.2d at 97–98 (concurring and dissenting opinion).

I agree with the majority that "it is this court's role to apply laws as the Council has written them, not as we would have ... written them ourselves." To do otherwise is to usurp a core legislative prerogative. In construing the Council's words, however, our lodestar must be actual legislative intent. Because in my view, the Council did not intend to compel judges to sentence Holiday, Burgess and Palmer to a mandatory minimum term of four years or, *a fortiori,* Ms. Park to a mandatory minimum term of five years, I dissent from those portions of the majority's decision that hold the contrary.